THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
HOMER HANRAHAN *et al.*, Defendants-Appellants.

First District (1st Division)    No. 77-777

Opinion filed September 11, 1978.—Rehearing denied October 10, 1978.

Lawrence J. Suffredin, Jr., of Chicago (Georgette Panutsos, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Kenneth T. McCurry, and Richard D. Heytow, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McGLOON delivered the opinion of the court:

Defendant Homer Hanrahan and his son, co-defendant Michael Hanrahan, were charged with conspiracy, murder, aggravated kidnapping, and aggravated battery of Marian Hanrahan, their respective wife and mother. In a joint jury trial, Homer Hanrahan was found guilty and sentenced to concurrent terms of 50 to 100 years for murder, 20 to 40 years for aggravated kidnapping, and 3 to 10 years for aggravated battery. Michael was found guilty of aggravated kidnapping and aggravated battery. He was sentenced to serve concurrent terms of 10 to 25 years for aggravated kidnapping and 3 to 10 years for aggravated battery.

On appeal, defendants argue that the trial court erred (1) in refusing to suppress certain statements made by defendants; (2) in refusing to grant defendant Homer Hanrahan's motion for severance; (3) in refusing to give the jury an instruction on involuntary manslaughter; and (4) in denying defendants' motion to remove the prosecutor from the case since he participated in its investigation. Defendant Michael Hanrahan also argues (5) that the jury's verdict of not guilty of murder but guilty of aggravated kidnapping is legally inconsistent.

We affirm.

At approximately midnight on November 22, 1974, Mary Ellen Hanrahan, age 16, went to the Niles Police Station to express worry about her mother, Marian Hanrahan. She related that when she arrived home at 9:30 p.m. on November 20, she was met at the door by her father,

defendant Homer Hanrahan. She indicated that it was unusual for him to be there since divorce proceedings were pending between him and her mother and further, because he was no longer living at the home. She noticed blood on his arm and chest which he explained was the result of a fight between the deceased and her brother, defendant Michael, but that everything was now settled.

Defendant Homer instructed her to go upstairs to her room, which she did. Once there, however, she listened at an air vent that led to the basement. She stated that she heard the deceased scream and that she heard her mother moan, "It hurts, it hurts."

A short time later, Mary Ellen heard her uncle, Gerry Wallenberg, bringing her brother Steve home from a birthday party. Defendant Michael opened the door for them. Mary Ellen stated that Michael was wearing only his undershorts and that they too, had blood on them. When Mary Ellen inquired what was wrong, defendant Michael told her that the deceased threatened him and that he hit her in the face. He further informed her that she could not see her because defendant Homer was in the basement talking to her. Thereafter Mary Ellen returned to her room and fell asleep.

The next morning, at approximately 7 a.m., Mary Ellen was awakened by the sound of her brother, defendant Michael Hanrahan, leaving for school. A short time later, defendant Homer Hanrahan came into her room to tell her to get ready for school. When Mary Ellen asked to see the deceased, defendant assured her that everything was all right and that her mother was still sleeping. Mary Ellen then left for school and when she returned, at approximately 2:15 p.m., she found a note from her father, stating that he and the deceased went on a trip and would return in a few days. Because it was unlike the deceased to leave without saying goodbye and because it was unusual for defendant Homer to spend the night at the house, Mary Ellen went to the police station later that night and related the above facts.

Following this conversation, the police officers accompanied Mary Ellen to her home. In the basement they discovered blood and observed that the floor had been freshly mopped. They also found a blood-stained mattress pad on Marian Hanrahan's bed and noticed that the sheets and covers were missing. Mary Ellen checked her mother's closet and found that none of her clothes were missing.

Later that day, police officers went to the fraternity house where defendant Michael Hanrahan was living. They arrested him for battery to his mother and read him his *Miranda* rights. He was then taken to the Niles Police Station.

At the station, defendant Michael made several statements, after first having been read his rights on each occasion. One of the statements,

which was introduced as evidence during trial and is part of this appeal, was given to Officer Giovannelli. The substance of the statement was that on November 20, 1974, defendant Michael heard his father and the deceased arguing in the basement. When he heard a loud crash, he ran downstairs and saw his father, defendant Homer Hanrahan, standing over the deceased with blood on him and saying "Oh my God, what have I done?" Defendant Michael stated further that at approximately 11:30 a.m. the next day, he helped his father place the deceased in the trunk of the car and that he heard her moan.

Before Officer Giovannelli was allowed to testify concerning this statement, the State objected on the ground that the statement only incriminated defendant Homer Hanrahan. However, defendant Homer stated that he did not object to the statement as long as the jury was instructed not to consider it against him. Accordingly, the court overruled the State's objection and admonished the jury to consider the statement only against defendant Michael.

Sometime during the evening of November 22, 1974, the day defendant Michael was arrested, police officers went to the home of Roberta Stiles. Miss Stiles was purportedly the girlfriend of defendant Homer Hanrahan. The officers knocked on the door and were admitted by Miss Stiles. Once inside, the officers observed defendant Homer's brown Chevrolet parked in the garage. The officer telephoned assistant State's Attorney Pappas, who advised the officers to open the trunk to determine whether the victim was still inside. The trunk was opened and the victim was found inside, dead.

Once arrested, defendant Homer was taken to the Niles Police Station where he was questioned by Mr. Pappas. He was also questioned by assistant State's Attorney Gino DiVito, who had previously questioned defendant Michael. During the questioning sessions, defendant Homer gave a statement, just as Michael had earlier.

During the trial, there was a discussion concerning the method of introducing the statements of the defendants. The trial court subsequently ruled that the statements could be admitted without excising references to the other co-defendant. The jury was then admonished that the statements could only be used against the declarant.

Mr. DiVito testified that defendant Michael Hanrahan related the following detailed account. On November 20, 1974, at 7:45 p.m., he and his father met at a restaurant. The purpose of the meeting was to discuss plans for holding the deceased captive until she agreed to sign title to the house in Niles over to the children. He stated that when they left the restaurant defendant Homer gave him a loaded, automatic pistol. Defendant Homer then went to purchase beer, while defendant Michael

went home, arriving there the same time as the deceased. They entered together and a short time later, defendant Homer arrived. All three of them then went into the basement where defendant Michael produced a gun and demanded that the deceased sign the house over to the children. During this time defendant Homer was attempting to blindfold the deceased. She struggled and in the process kicked defendant Michael in the groin. In response, defendant Michael hit her on the head with the gun, causing her to fall to the floor unconscious. The deceased bled profusely and the defendants used towels to clean up the blood. When the deceased occasionally regained consciousness, defendant Homer would administer chloroform.

Defendant Michael told Mr. DiVito that a slit was then cut into the deceased's slacks, through which defendant Homer injected drugs directly into her buttocks and anus. Previously, defendant Homer had bound the deceased's hands and feet. When Mary Ellen and Steve came home, they were sent directly to bed. Because both defendants were splattered with blood, they removed their outer clothing and washed them in the washing machine. Defendants later carried the deceased up to her bedroom and defendant Michael went to sleep.

The next time defendant Michael saw the deceased was at 6:30 a.m. the next day. She was in bed, with a bandage wrapped around her head. Defendant Homer assured him that everything was all right, so he left for school. When he returned from school at approximately 10:30 a.m., he helped defendant Homer carry the deceased from the bedroom. She was wrapped in the sheets and blankets from the bed and placed into the trunk of the car. It was at this point that defendant Michael believed he heard the deceased groan. He noticed that the deceased was naked and that her arms and legs were still tied. Before leaving the house, defendant Homer wrote a note to Mary Ellen and Steve, explaining that their mother and he were going on a vacation.

Mr. DiVito also testified concerning a post-arrest statement given by defendant Homer Hanrahan in the presence of Mr. Pappas and Mr. DiVito. Mr. DiVito testified that defendant Homer stated, "Blame it all on me. I did it, my son was not involved." He then went on to give the location of the gun, blankets, towels, bandages, and the deceased's clothing. Defendant Homer identified the drug used as Sparine and admitted injecting it into the deceased's buttocks. Defendant Homer stated that he was familiar with drugs because of his previous employment as a drug salesman. He further stated that defendant Michael hit the deceased in the head with the gun after she produced a knife. At this point, Mr. DiVito testified, defendant Homer requested an attorney and the interview then ceased.

At this point in the trial, the jury was again admonished that the

statements of each defendant could only be considered against the declarant and not against the other co-defendant.

At the opening of the defendants' case, defendant Homer Hanrahan testified in his own behalf. He testified that on November 20, 1974, he met defendant Michael at a restaurant at 7:45 p.m., prior to a prearranged meeting with the deceased. The purpose of the meeting with the deceased was to work out a property settlement in their pending divorce. He stated that he wanted to get the deceased away from the influence of her parents while working out the settlement.

On his way to the deceased's house, he stopped at a liquor store to cash a check and purchase beer. He stated that when he arrived at the deceased's house, he noted that her eyes and walk appeared "funny." The deceased was an epileptic and occasionally had seizures. The seizures were never severe, but on occasion, defendant Homer had to inject her with Sparine in order to calm her.

Defendant Homer and the deceased proceeded to the basement where they began sorting certain bills that he had paid and believed should be credited towards his child-support payments. He testified that during this time the deceased began yelling and screaming incoherently and then collapsed to the floor. When he tried to pick her up, she produced a knife. A struggle ensued, during which two tables were overturned and he received a cut on his hand. At this point defendant Michael entered the basement and attempted to separate them. The deceased kicked Michael and then bumped her head on a post, causing her to fall to the floor bleeding and semiconscious. Defendant Homer then went into the kitchen to find towels so that he could clean up the blood.

When defendant Homer went back to the basement, defendant Michael suggested that they call a doctor. Defendant Homer refused, however, because he believed that the deceased would blame him for her injuries and that he would be arrested.

Mary Ellen had since arrived home and been sent to bed. Because defendant Homer did not want her to hear the deceased moaning, he injected the deceased with Sparine. In order to do this, he cut a slit in her slacks and attempted to administer a tablet rectally. When several attempts failed, he injected a quantity of the drug directly into her anus and buttocks. At this time the deceased was moaning and said "It hurts." Thereafter, both defendants washed their clothes and cleaned the basement.

At approximately 10:15 p.m., Jerry Wallenberg, defendant Homer's brother-in-law, telephoned to say that he was bringing Steve Hanrahan home. Fearful of being discovered, defendant Homer covered the deceased's mouth with tape and gave her another injection of Sparine.

After Steve was sent to bed, the defendants carried the deceased to her

bedroom. Defendant Michael again suggested that a doctor be called, but defendant Homer refused, assuring Michael she would be fine after she "slept it off." Defendant Homer then undressed the deceased and pulled covers over her.

The next morning, after all of the children, including defendant Michael had left for school, defendant Homer attempted to awaken the deceased. When she would not awaken, he realized that she was dead. Panicking, he attempted to lift her from the bed, but could not do so because she was too heavy and her arms and legs were too cumbersome. In order to facilitate her eventual removal from the room, he bound her arms and legs.

When defendant Michael unexpectedly returned home at 10:30 a.m., defendant Homer informed him that his mother was dead. The two defendants then placed the body in the trunk of the car and defendant Homer drove to the home of Roberta Stiles where he was later arrested. Defendant Michael went to a job interview.

At the conclusion of the trial, the jury found defendant Homer Hanrahan guilty of murder, aggravated battery, aggravated kidnapping, and conspiracy. He was sentenced to serve concurrent sentences of 50 to 100 years for murder, 20 to 40 years for aggravated kidnapping, and 3 to 10 years for aggravated battery. Defendant Michael Hanrahan was found guilty of aggravated kidnapping, aggravated battery, and conspiracy. He was sentenced to serve concurrent sentences of 10 to 25 years for aggravated kidnapping and 3 to 10 years for aggravated battery. Defendants appeal.

On appeal, defendants first argue that the trial court erred in denying their motion to quash the arrests and in denying their motion to suppress the evidence and statements obtained therefrom. They argue that the arrest of defendant Michael Hanrahan was not based upon probable cause and therefore, that all of the statements and evidence recovered following that arrest should have been suppressed.

■■■ We disagree. In Illinois, a police officer may arrest a person when he has reasonable grounds to believe that the person is committing or has committed an offense. (Ill. Rev. Stat. 1977, ch. 38, par. 107—2(c).) Further, the test for reasonableness of the officer's belief is whether a reasonable and prudent man in the officer's position and in possession of his knowledge would believe that the person arrested committed the offense. (*People v. Garza* (1976), 44 Ill. App. 3d 30, 357 N.E.2d 1264.) Under the facts of the present case, the police officers had reasonable grounds to believe that defendant Michael Hanrahan was guilty of battery to his mother.

Mary Ellen Hanrahan told police officers that on the night of November 20, 1974, she heard an argument between the deceased and the

defendants. She also observed blood on the defendants and heard her mother moan, "It hurts, it hurts." She stated that she was refused access to the deceased and was told by defendant Michael that he had hit her in the face. The next day, the deceased was gone and so were her bed sheets and covers. When police arrived at the Hanrahan home, they discovered blood in the basement and also on the mattress cover of the deceased's bed. Consequently, we believe these facts established reasonable grounds to cause a reasonable and prudent man to believe that defendant Michael Hanrahan had committed battery to his mother. His arrest was therefore lawful.

Defendant Homer Hanrahan argues that the trial court should have granted his motion for severance, based upon the incriminating statements given by defendant Michael. In support of his contention that his motion to sever should have been granted, he cites *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.

The present case is not analogous to the facts in *Bruton*. In *Bruton*, two defendants were tried jointly and the confession of one defendant, in which he implicated his co-defendant who had not confessed, was admitted. Neither defendant testified at trial. Consequently, the Supreme Court held that the co-defendant who had not confessed was denied the right to confront his accuser. Here, however, both defendants made statements to the police that were later introduced at trial. While defendant Michael's statement was more detailed than defendant Homer's, both statements were substantially similar. In fact, in the course of a conversation with Mr. DiVito and after having been given his rights, defendant Homer said "Blame it all on me. I did it, my son was not involved." Further, during the trial defendant Homer even consented to the introduction of defendant Michael's statement into evidence, as long as the jury was properly instructed, which they were, on several occasions.

■ Finally, in *People v. Rosochacki* (1969), 41 Ill. 2d 483, 244 N.E.2d 136, a case very similar to the one at present, the court stated:

> "It is clear to us that a very substantial difference exists between a case in which a jury hears a co-defendant's statement incriminating a defendant who has himself made similar inculpatory admissions, and the *Bruton*-type case in which the co-defendant's statement is used against a defendant who has made no admissions. In the former case the prejudice to the defendant, if any, is minimal, and entirely insufficient to necessitate retrial, particularly where, as here, defendant's guilt seems clear." (41 Ill. 2d 483, 494, 244 N.E.2d 136, 142.)

We believe the rationale of *Rosochacki* is controlling here and therefore

conclude that the trial court correctly denied defendant Homer Hanrahan's motion for severance.

Defendant Homer Hanrahan next argues that the trial court erroneously refused his instruction on involuntary manslaughter. He believes that an instruction on involuntary manslaughter was proper since the jury could have concluded that his conduct was merely reckless.

■ We disagree. In order to support a murder conviction, it is not necessary for the State to prove that the defendant intended to kill the victim, but only that he voluntarily and wilfully committed an act which had the natural tendency to cause death or great bodily harm. (*People v. Mitchell* (1973), 12 Ill. App. 3d 960, 299 N.E.2d 472.) Similarly, in *People v. Cannon* (1971), 49 Ill. 2d 162, 273 N.E.2d 829, the court held where the defendant intentionally pointed and fired a gun into a crowd of people, though not intending to kill anyone, the trial court did not err in refusing an instruction on involuntary manslaughter.

■ In the case at bar, defendant Homer admitted that he voluntarily and wilfully injected drugs into the deceased, taped her mouth shut, and refused to call a doctor. Under the rationale of *Mitchell* and *Cannon* it is clear that his conduct cannot be construed as reckless since he acted of his own volition and his acts had the natural tendency to cause death or great bodily harm.

Defendants next argue that the jury's verdict finding defendant Michael Hanrahan guilty of aggravated kidnapping, but not guilty of murder was legally inconsistent. They argue that such an outcome cannot stand where the felony-murder doctrine is applicable.

■ We disagree. In *People v. Murray* (1975), 34 Ill. App. 3d 521, 340 N.E.2d 186, we held that neither legal nor logical consistency of verdicts is now required. In that case the defendant walked into a crowded bar and began firing a gun at patrons. One person was killed and several others were wounded. Defendant was found guilty of murder but not guilty of aggravated battery. Addressing the issue of the legal consistency of the verdicts and relying on *People v. Dawson* (1975), 60 Ill. 2d 278, 326 N.E.2d 755, we stated:

> "We emphasize that our Supreme Court said that, even considering the case as though it involved *only* the matter of a verdict of not guilty of felony-murder under the accountability statute and a verdict of guilty of the same forcible felony involved, it did not agree with the appellate court majority's reasoning because it thought that the appropriate consideration was that the jury may have acquitted Dawson of felony-murder because the jury believed that its conviction of Dawson for the armed robbery provided sufficient punishment for what Dawson had done, and

that that consideration forbids allowing the acquittal to upset or even to affect the simultaneous conviction. The jury's historic power of lenity must prevail, not only over the risk of an occasional compromise conviction of the lesser crime, but also over the traditional doctrine concerning legally and logically inconsistent verdicts." (34 Ill. App. 3d at 521, 536, 340 N.E.2d at 186, 197.)

It is clear, therefore, that Illinois no longer requires that verdicts be legally consistent. (See also *People v. Parks* (1977), 49 Ill. App. 3d 65, 363 N.E.2d 93.) Accordingly, defendant Michael Hanrahan's conviction for aggravated kidnapping must stand.

■ Finally, defendants argue that it was error for the trial court to allow assistant State's Attorney Pappas to act as the prosecutor in the case since he participated in its investigation. The defendants argue that the mention of Mr. Pappas' name during the course of the trial prejudiced their case. While there is little case law on the issue, we believe that the trial court properly ruled that Mr. Pappas could act as the prosecutor in this case. His role during the investigation of this case was relatively minor. Almost all of the investigatory work, particularly the questioning of the defendants and witnesses, was handled by other assistant State's attorneys or police officers. Although Mr. Papas testified at the motion to suppress hearing, he never testified at trial. Only once during opening statements did he mention his involvement in the case, for which he was quickly admonished by the court. Consequently, we fail to see how the defendants were in any way prejudiced by Mr. Pappas acting as prosecutor in this case. See *People v. Bissonnette* (1974), 20 Ill. App. 3d 970, 313 N.E.2d 646.

For the foregoing reasons, the judgments of the circuit court of Cook County are affirmed.

Judgments affirmed.

O'CONNOR and BUCKLEY, JJ., concur.