UNITED STATES of America ex rel. Homer E. HANRAHAN, Petitioner,

v.

James H. THIERET, Warden, Respondent.

No. 86 C 244.

United States District Court, N.D. Illinois, E.D.

Sept. 19, 1990.

Cynthia Grant Bowman, Suzanne Isaacson, Sr. Law Student, Chicago, Ill., for petitioner.

Neil F. Hartigan, Atty. Gen. of Ill., Jack Donatelli, Asst. Atty. Gen., Chicago, Ill., for respondent.

MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This long-lived 28 U.S.C. § 2254 ("Section 2254") petition for habeas corpus relief sought by Homer Hanrahan ("Homer") is back before this Court on remand from our Court of Appeals. That court's "Opinion II" (896 F.2d 241 (7th Cir.1990)) affirmed this Court's "Opinion I" (695 F.Supp. 372 (N.D.Ill.1988)) in all respects save the open issue of whether the state court's erroneous admission of statements of Homer's son and codefendant Michael Hanrahan ("Michael") amounted to harmless error.[1]

---

**1.** All citations to Opinion I and Opinion II will refer only to the page number, omitting the F.Supp. and F.2d volume numbers.

For the reasons stated in this memorandum opinion and order, this Court holds that those errors were not harmless and that Homer is entitled to a new trial without constitutional infirmities.

## Background

Homer and his son Michael were jointly charged with conspiracy, aggravated kidnapping, aggravated battery and murder stemming from the death of Homer's estranged wife (and Michael's mother) Marian Hanrahan ("Marian"). After a joint trial the jury convicted Homer of all the charges, and he was sentenced to concurrent sentences of 50 to 100 years for murder, 20 to 40 years for aggravated kidnapping and 3 to 10 years for aggravated battery.[2] Michael was convicted of all charges except murder and was given concurrent sentences of 10 to 25 years for aggravated kidnapping and 3 to 10 years for aggravated battery (see n. 1). Their convictions were affirmed by the Appellate Court (*People v. Hanrahan*, 64 Ill.App.3d 207, 20 Ill.Dec. 866, 380 N.E.2d 1075 (1st Dist.1978)), the Illinois Supreme Court denied leave to appeal (*People v. Hanrahan*, 72 Ill.2d 583 (1979)) and the United States Supreme Court denied certiorari (444 U.S. 828, 100 S.Ct. 53, 62 L.Ed.2d 36 (1979)).

On August 23, 1988 this Court issued Opinion I denying Homer's petition for habeas corpus. Among other things Opinion I held that:

1. the trial court violated Homer's Sixth Amendment[3] rights under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) when it admitted into evidence certain statements by Michael, where Michael did not testify and was not subject to cross-examination by Homer's counsel as to those statements; but

2. it was harmless error to admit into evidence the one statement that Homer's attorney had urged in the briefs as having prejudiced Homer in the trial.

Opinion II then upheld this Court on the existence of the *Bruton* violation and on all non-*Bruton* issues dealt with in Opinion I, but it found that Homer's petition had preserved for review complaints relating to several *Bruton*-violative statements in addition to the one that the parties stressed in their briefs. Accordingly the case was remanded for the sole purpose of enabling this Court to determine whether the admission of *all* of Michael's statements, when considered in their totality, still constituted harmless error.[4]

That kind of evaluation requires a review of the relevant facts. And although this case has already been kicking around the Illinois and federal court systems long enough to have occupied a fair amount of law library shelf space, the very nature of the harmless error determination unfortunately makes unavoidable a good deal of repetition of what has gone before. To minimize duplicative effort, this opinion will borrow unabashedly from the Illinois Appellate Court opinion's statement of facts (*People v. Hanrahan*, 64 Ill.App.3d at 208–13, 20 Ill.Dec. at 868–871, 380 N.E.2d at 1077–80) for substantial portions of the following statement.[5]

---

**2.** At the sentencing hearing the trial judge vacated both defendants' convictions on the conspiracy charge (R. 1843).

**3.** As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the Sixth Amendment's underlying Bill of Rights provision (which of course imposes limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).

**4.** See Appendix.

**5.** Both because of the accuracy of the Illinois Appellate Court's factual statement and in view of the command of Section 2254(d) (see *Sumner v. Mata*, 449 U.S. 539, 543–47, 101 S.Ct. 764, 767–69, 66 L.Ed.2d 722 (1981)), when this Court last had to relate the facts of this case (Opinion I at 375, 395–98) it simply attached a photocopy of the relevant portions of the Appellate Court decision as an Appendix. While that arrangement worked well there, the current issues may best be clarified by organizing the facts somewhat differently. Accordingly, at the risk of further burdening this Court's secretary with so much retyping, this opinion will work entire blocks of text from the Appellate Court decision into its own factual narration. Those blocks of text will be indented to signal this Court's debt to the Appellate Court, but no further references

## Factual Record

At trial the jury heard three kinds of evidence:

1. circumstantial evidence in the form of (a) testimony of Mary Ellen Hanrahan ("Mary Ellen")—the daughter of Homer and Marian—about what she heard on the night of Marian's death that caused her to go to the police, (b) testimony of investigating officers about the physical evidence recovered at the scene and with the body and (c) testimony by the coroner as to the causes and circumstances of death;

2. Homer's own descriptions—both to police and at trial—of the events leading to Marian's death; and

3. Michael's statements to police about those same events.

Because it is necessary to decide whether admission of the third kind of evidence—Michael's statements—was harmless error in light of the strength of the other two kinds, it will be useful to set out each category separately.

### 1. Circumstantial Evidence.

Police investigators and Mary Ellen testified that it was Mary Ellen who first alerted police to suspected foul play by Homer and Michael against Marian:

At approximately midnight on November 22, 1974, Mary Ellen Hanrahan, age 16, went to the Niles Police Station to express worry about her mother, Marian Hanrahan. She related that when she arrived home at 9:30 p.m. on November 20, she was met at the door by her father, defendant Homer Hanrahan. She indicated that it was unusual for him to be there since divorce proceedings were pending between him and her mother and further, because he was no longer living at the home. She noticed blood on his arm and chest which he explained was the result of a fight between the deceased and her brother, defendant Michael, but that everything was not settled.

Defendant Homer instructed her to go upstairs to her room, which she did.

Once there, however, she listened at an air vent that led to the basement. She stated that she heard the deceased scream and that she heard her mother moan, "It hurts, it hurts."

A short time later, Mary Ellen heard her uncle, Jerry Wallenberg, bringing her brother Steve home from a birthday party. Defendant Michael opened the door for them. Mary Ellen stated that Michael was wearing only his undershorts and that they too, had blood on them. When Mary Ellen inquired what was wrong, defendant Michael told her that the deceased threatened him and that he hit her in the face. He further informed her that she could not see her because defendant Homer was in the basement talking to her. Thereafter Mary Ellen returned to her room and fell asleep.

The next morning, at approximately 7 a.m., Mary Ellen was awakened by the sound of her brother, defendant Michael Hanrahan, leaving for school. A short time later, defendant Homer Hanrahan came into her room to tell her to get ready for school. When Mary Ellen asked to see the deceased, defendant assured her that everything was all right and that her mother was still sleeping. Mary Ellen then left for school and when she returned, at approximately 2:15 p.m., she found a note from her father, stating that he and the deceased went on a trip and would return in a few days. Because it was unlike the deceased to leave without saying goodbye and because it was unusual for defendant Homer to spend the night at the house, Mary Ellen went to the police station later that night and related the above facts.

Following this conversation, the police officers accompanied Mary Ellen to her home. In the basement they discovered blood and observed that the floor had been freshly mopped. They also found a blood stained mattress pad on Marian Hanrahan's bed and noticed that the sheets and covers were missing. Mary Ellen checked her mother's closet and

to the pages from which they were lifted will be       made.

found that none of her clothes were missing.

Later that day police officers arrested Michael at the fraternity house where he was living. He was taken to the Niles Police Station, where he gave the statements described in more detail below. Those statements led police to the home of Homer's girlfriend Roberta Stiles ("Stiles") and caused them to suspect that Marian might be found in the trunk of Homer's car. When police found Homer's car at Stiles' house and opened the trunk, they found Marian's naked dead body inside. Along with the body police found Marian's purse, some hypodermic syringes, various drugs, a drug salesman's sample kit with empty slots (Homer had been a drug salesman for Wyeth Labs), a bottle labelled chloroform, a paper towel shaped into a cup and a suitcase that contained a hunting knife, boxes with medication labels and a vibrator (R.347, 399, 282–84). In addition to the automobile trunk contents, other physical evidence admitted at trial included two pistols that were in Stiles' home (one of which had traces of blood on the butt), sheets, towels and a blanket discovered in Stiles' basement, an attache case from the back seat of Homer's car and bloodstained clothing belonging to Michael and Homer.

According to the testimony of the coroner and a toxicologist who ran tests on Marian's body, the cause of death was acute morphine intoxication (R.546). Numerous bruises were evident on the side, shoulder and head, but those were at most a secondary contributing cause of death (R.572–79)—no bleeding had resulted and the skull had not been fractured (R.565–66). Tests of Marian's blood, urine and bile showed a toxic level of morphine along with non-lethal doses of a tranquilizer and barbiturates, a small amount of alcohol and a trace amount of chloroform (R.667–69). Only one of the drugs police recovered could have been the source of the morphine that killed Marian: the cough medicine Phenergan containing codeine. If that were the only source, however, the experts testified that Marian would have had to ingest 5 to 10 of the little bottles the police found.

## 2. Homer's Statements.

After his arrest, Homer was questioned by Assistant State's Attorneys Pappas and DiVito. DiVito testified at trial that Homer told him, "Blame it all on me. I did it, my son was not involved." He also told police that Michael had hit Marian in the head with a gun after she produced a knife, and he told police where they could find the gun, blankets, towels, bandages and the deceased's clothing. He also admitted to them that he had injected Sparine into Marian's buttocks and explained that he had gained a familiarity with drugs through his previous employment as a drug salesman. DiVito testified that Homer then requested an attorney and the interview ended.

In addition to hearing DiVito's retelling of Homer's story, the jury heard from Homer himself:

At the opening of the defendants' case, defendant Homer Hanrahan testified in his own behalf. He testified that on November 20, 1974, he met defendant Michael at a restaurant at 7:45 p.m., prior to a prearranged meeting with the deceased. The purpose of the meeting with the deceased was to work out a property settlement in their pending divorce. He stated that he wanted to get the deceased away from the influence of her parents while working out the settlement.

On his way to the deceased's house, he stopped at a liquor store to cash a check and purchase beer. He stated that when he arrived at the deceased's house, he noted that her eyes and walk appeared "funny." The deceased was an epileptic and occasionally had seizures. The seizures were never severe, but on occasion, defendant Homer had to inject her with Sparine in order to calm her.

Defendant Homer and the deceased proceeded to the basement where they began sorting certain bills that he had paid and believed should be credited towards his child support payments. He testified that during this time the deceased began yelling and screaming incoherently and then collapsed to the floor. When he

tried to pick her up, she produced a knife. A struggle ensued, during which two tables were overturned and he received a cut on his hand. At this point defendant Michael entered the basement and attempted to separate them. The deceased kicked Michael and then bumped her head on a post, causing her to fall to the floor bleeding and semiconscious. Defendant Homer then went into the kitchen to find towels so that he could clean up the blood.

When defendant Homer went back to the basement, defendant Michael suggested that they call a doctor. Defendant Homer refused, however, because he believed that the deceased would blame him for her injuries and that he would be arrested.

Mary Ellen had since arrived home and been sent to bed. Because defendant Homer did not want her to hear the deceased moaning, he injected the deceased with Sparine. In order to do this, he cut a slit in her slacks and attempted to administer a tablet rectally. When several attempts failed, he injected a quantity of the drug directly into her anus and buttocks. At this time the deceased was moaning and said "It hurts." Thereafter, both defendants washed their clothes and cleaned the basement.

At approximately 10:15 p.m., Jerry Wallenberg, defendant Homer's brother-in-law, telephoned to say that he was bringing Steve Hanrahan home. Fearful of being discovered, defendant Homer covered the deceased's mouth with tape and gave her another injection of Sparine. After Steve was sent to bed, the defendants carried the deceased to her bedroom. Defendant Michael again suggested that a doctor be called, but defendant Homer refused, assuring Michael she would be fine after she "slept it off." Defendant Homer then undressed the deceased and pulled covers over her.

The next morning, after all of the children, including defendant Michael had left for school, defendant Homer attempted to awaken the deceased. When she would not awaken, he realized that she was dead. Panicking, he attempted to lift her from the bed, but could not do so because she was too heavy and her arms and legs were too cumbersome. In order to facilitate her eventual removal from the room, he bound her arms and legs.

When defendant Michael unexpectantly [sic] returned home at 10:30 a.m., defendant Homer informed him that his mother was dead. The two defendants then placed the body in the trunk of the car and defendant Homer drove to the home of Roberta Stiles where he was later arrested. Defendant Michael went to a job interview.

### 3. Michael's Statements.

This controversy really turns, however, on how the jury was likely to have been impacted by three statements that Michael made to police and prosecutors, to which they then testified at trial. This opinion will first recount the statements themselves, then turn to that analysis.

*Statement 1.* Officer Giovannelli testified that at 7 a.m. on November 22—approximately one hour after his arrest—Michael told him that on November 20 he had slapped Marian during a fight with her and that he last saw her leaving home with Homer about noon on November 21 (R.220).

*Statement 2.* Giovannelli then testified that about an hour and a half later Michael told a different story. At about 8:20 a.m. Michael told Giovannelli that he had heard Homer and Marian arguing in the basement and ran downstairs after he heard a loud crash. There he saw Homer standing over Marian with blood on him saying, "Oh my God, what have I done?" [6] Michael also told Giovannelli that when he helped Homer put Marian's body in the trunk of the car he may have heard a moan (R.323).

---

6. That part of Michael's second statement was testified to by both Officer Giovannelli (R. 323) and Officer Sheehan (R. 369).

*Statement 3.* Assistant State's Attorney DiVito also testified to a third, more detailed statement by Michael:

Mr. DiVito testified that defendant Michael Hanrahan related the following detailed account. On November 20, 1974, at 7:45 p.m., he and his father met at a restaurant. The purpose of the meeting was to discuss plans for holding the deceased captive until she agreed to sign title to the house in Niles over to the children. He stated that when they left the restaurant defendant Homer gave him a loaded, automatic pistol. Defendant Homer then went to purchase beer, while defendant Michael went home, arriving there the same time as the deceased. They entered together and a short time later, defendant Homer arrived. All three of them then went into the basement where defendant Michael produced a gun and demanded that the deceased sign the house over to the children. During this time defendant Homer was attempting to blindfold the deceased. She struggled and in the process kicked defendant Michael in the groin. In response, defendant Michael hit her on the head with the gun, causing her to fall to the floor unconscious. The deceased bled profusely and the defendants used towels to clean up the blood. When the deceased occasionally regained consciousness, defendant Homer would administer chloroform.

Defendant Michael told Mr. DiVito that a slit was then cut into the deceased's slacks, through which defendant Homer injected drugs directly into her buttocks and anus. Previously, defendant Homer had bound the deceased's hands and feet. When Mary Ellen and Steve came home, they were sent directly to bed. Because both defendants were splattered with blood, they removed their outer clothing and washed them in the washing machine. Defendants later carried the deceased up to her bedroom and defendant Michael went to sleep.

The next time defendant Michael saw the deceased was at 6:30 a.m. the next day.

She was in bed, with a bandage wrapped around her head. Defendant Homer assured him that everything was all right, so he left for school. When he returned from school at approximately 10:30 a.m., he helped defendant Homer carry the deceased from the bedroom. She was wrapped in the sheets and blankets from the bed and placed into the trunk of the car. It was at this point that defendant Michael believed he heard the deceased groan. He noticed that the deceased was naked and that her arms and legs were still tied. Before leaving the house, defendant Homer wrote a note to Mary Ellen and Steve, explaining that their mother and he were going on a vacation.

When this Court first faced the *Bruton* issue, it was in the framework in which the parties presented it—how the jury was affected by the image of a bloody Homer standing over Marian and saying, "Oh my God, what have I done?" This Court found the reference to that statement by Michael, though indeed *Bruton*-violative, was harmless error in the legal sense because (1) the statement played a minor role in the prosecution's case, (2) Homer admitted having said something very much like it and did not rule out the possibility that he had said exactly that, (3) the statement concerned the source of Marian's head wounds, which the pathologists testified were not the major cause of death and which (regardless of who inflicted them) would in any case have been imputed to both defendants under a conspiracy theory and (4) if anything, the statement detracted from the prosecution's case by presenting a version of the facts different from the detailed third statement, the one the State wanted the jury to believe. Although our Court of Appeals agreed with that treatment of the "Oh, my God" statement (896 F.2d at 243), it remanded for this Court to address the effect of the other statements that Homer's able counsel did not stress in the first go-round.

### Harmless Error [7]

■ As Opinion I at 384 paraphrased *United States ex rel. Sanders v. Lane,* 835 F.2d 1204, 1206 (7th Cir.1987), the standard on the narrow issue of harmless error, respon-

7. Although our Court of Appeals' remand was

for finding a constitutional error harmless is strict indeed:

> The admission of [Michael's] statement is harmless only if there is no reasonable possibility that [Michael's] statement might have contributed to [Homer's] conviction.... Thus, unless we are convinced beyond a reasonable doubt that the jury would have convicted [Homer] absent [Michael's] statement we must [grant] his habeas corpus petition.

R.Mem. 1 argues that Homer bears the burden of proving the constitutional errors in his trial were not harmless beyond a reasonable doubt. None of the cases respondent cites, however, says anything about the burden of proof.[8] More importantly, given the limited scope available to

a district court on remand, respondent again (see n. 7) appears to be trying to persuade this Court to accept a legal conclusion that respondent had already urged on our Court of Appeals without success. Our Court of Appeals rejected respondent's proffered standard for three reasons (896 F.2d at 244–45), but at this stage of the litigation the first will suffice: By failing to make the current burden-of-proof argument when first before this Court, respondent waived his opportunity to raise it on appeal. On remand this Court must view that Court of Appeals determination of waiver as law of the case, and respondent must live with it.[9]

█ In an effort to meet his burden, respondent argues that all the statements

---

dent asks this Court to duck that issue by finding that under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) the rule of *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987) should not apply retroactively to undercut Hanrahan's conviction. Whatever the merits of that position, the State may not resurrect that argument here. R.Mem. 20 says only this about the current attempt to raise the issue for the first time before this Court:

> Respondent raises the *Teague* issue now for the first time to this Court because *Teague* was not decided until after this Court denied the petition in this cause.

That statement, though true enough, disingenuously fails to note that the *Teague* issue is not new to this case. Indeed, respondent has already presented that issue to our Court of Appeals, and that court (896 F.2d at 245) has found that issue waived by the State's failure to raise it before this Court earlier. That decision is now law of the case, and this Court may not question it.

**8.** Indeed, one case that he cites (*Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986)) really suggests that the *State* bears the ultimate burden. *Van Arsdall* describes the issue as framed by the state court this way (emphasis added):

> After concluding that the trial judge's ruling was constitutional error, the Delaware Supreme Court *rebuffed the State's effort to show* "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

**9.** Respondent's attempt to beguile this Court is all the more transparent when one compares his mischaracterization of Hanrahan's position

("Hanrahan has correctly stated that it is his burden to meet this standard on review ...") with the passage of Hanrahan's memorandum to which R.Mem. 1 must refer (P.Mem. 15, citations omitted, emphasis in original):

> The standard of review in harmless error cases is whether the constitutional error was harmless beyond a reasonable doubt. The Seventh Circuit has held that "[t]he admission of [a co-defendant's] statement is harmless only if there is no reasonable possibility that [the co-defendant's] statement might have contributed to [petitioner's] conviction."

> Under this standard, Homer is not required to prove that Michael's wrongfully admitted statements were *harmful.* Rather, "harmless error analysis must focus on the *potential* contribution of the tainted evidence" to Homer's conviction. Thus, to find the *Bruton* errors harmless in this case, this Court must be "convinced beyond a reasonable doubt that the jury would have convicted [Homer] absent [Michael's] statement[s]."

That passage says no such thing as respondent would have it. When Homer says it is not his burden to show the statements were harmful, it does not at all follow that he is acquiescing in bearing the burden of showing the statements were not harmless (in fact, the more natural reading is one of contrast—of saying that *Homer* is not required to prove anything, with the natural inference that the State *is*). In addition, respondent must know that is not Homer's position, because that very issue was contested in the Court of Appeals—and respondent lost. Thus not only does respondent pursue before this Court a legal position that our Court of Appeals has already rejected in this case—and without calling this Court's attention to that fact or explaining why that rejection should not control—but he does so by blatantly mischaracterizing petitioner's submission on the issue.

**610**

Michael made were cumulative of other evidence adduced at trial. But *Sanders,* 835 F.2d at 1207 (again adapted to this case with emphasis added) shows that really misses the mark:

> [W]hether [Homer] could have been convicted on the basis of his own statement is not the target of our inquiry. Our harmless error analysis must focus on the *potential contribution* of the tainted evidence—[Michael's] statement—to [Homer's] conviction.

Here the record clearly shows that Michael's testimony had a serious potential for contributing to Homer's conviction, even though Homer might well have been convicted on the basis of his own statement by itself. In fact, not only did Michael's statements have such a contributory potential, but at least with respect to the conspiracy and kidnapping charges it certainly seems likely that Michael's statements were instrumental in obtaining Homer's conviction.

As for the conspiracy count—which of course requires a finding that the codefendants agreed to do something—the only direct evidence to support that conviction was Michael's statement that he and Homer had met at a restaurant before going to Marian's house and had agreed to kidnap Marian until she signed title of the house over to the children. In addition, Michael said that as they left the restaurant Homer gave him the pistol that was later used against Marian. R.Mem. 16–17 clearly comes up short in attempting to catalog other "evidence" that could support a conspiracy conviction:

> As to conspiracy, Homer's own testimony revealed that Homer and Michael had a special relationship that was aligned against and schemed against Marian. For instance, Homer set Michael up as the owner of M & H Plumbing and Homer was Michael's employee; Homer bought Michael a car; Michael surreptitiously sent Homer copies of letters between Marian and her attorney; Homer sent Michael numerous notes in Homer's own handwriting containing questions about finances that Michael would ask of Marian; Homer sent Michael a note asking him to set up a meeting with Marian and Michael relayed the message for the meeting; Homer knew that Michael agreed with Homer that Homer was not getting all the credit he deserved for his financial support; and Homer admitted that he and Michael arranged to meet at the restaurant before meeting with Marian.

The prosecution also had independent evidence of Michael's complicity and participation in the occurrences which led to Marian's death. This came in large part from Mary Ellen's testimony which showed that Michael's participation in the scheme was on par with Homer's.

Regardless of whether Homer and Michael generally acted as though their interests coincided as against Marian, that could not suffice to support a finding that they reached an agreement to kidnap or to kill Marian. Nor did Mary Ellen's testimony clearly show Michael's participation to have been "on par with Homer's." That characterization is belied by the fact that in the view of the jury—the only view relevant here—Homer's participation constituted murder while Michael's did not. There is no reason to believe that the jury would have equated Michael's complicity with a conspiratorial agreement absent Michael's statement to that effect, and it is impossible to conclude that Michael's statement had no potential to impact Homer's case detrimentally.

As for the kidnapping charge, petitioner complains primarily of two aspects of Michael's statements: (1) his already-discussed statement that Michael and Homer agreed to kidnap Marian and (2) his statement that he may have heard Marian moan when they placed her in the trunk of Homer's car. Respondent says that evidence was cumulative of the pathologist's testimony that Marian had eaten four to six hours before her death and that she had died 24 to 48 hours before the November 23 autopsy. Respondent concludes that Marian must have eaten at some time after having been placed in the trunk of the car, or at any rate well after Homer said he last saw Marian alive on the night of November 20.

While the jury might conceivably have found that evidence persuasive by itself,[10] the record demonstrates that the State clearly did not expect the jury to rely on that evidence to find defendants guilty of kidnapping. In fact, the closing arguments of Assistant State's Attorney Pappas treated the pathologist's conclusions about the time of death simply as one piece of evidence that could corroborate one part of Michael's statement—but at the same time made obvious· the intention that the jury should consider *Michael's* statement the main event. He summed up what the State wanted the jury to consider (R.1712, emphasis added):

> We don't want sympathy. I could stand before you and tell you and look you straight in the face and tell you that the people of the community, based on the evidence that you have got, *corroborated admissions to the deputy state's attorney* of this county, the people of this community demand justice from you.

Even if every fact Michael related had been fully corroborated by other evidence like the coroner's testimony, that could not have had the same kind of impact on the jury as would Michael's own admission. This is not a case in which the prosecution made a technical error in the presentation of a relatively minor piece of evidence, without which the State's case would sure-

ly have been just as overwhelming. Here the mistakenly-admitted evidence is at the very core of the State's case, and it comes in the form most damaging for the defense—the voluntary admission of one codefendant that inculpates both. One would have to be blind to reality to believe that the State's case gained nothing from having been presented out of the mouth of Michael rather than solely that of the State's Attorney. Given the prosecution's heavy reliance on Michael's statement and the thinness of other evidence that could support either conviction, it is impossible to find that the conspiracy and kidnapping convictions were not significantly tainted by the admission of Michael's statements.[11]

As for the murder conviction, respondent is clearly correct in asserting that Michael's first and second statements—except for the already mentioned statement that Marian may have moaned when put in the trunk—really could not have damaged Homer's defense because they actually detracted from the prosecution's theory of the case. Michael's third statement, however, was undoubtedly not harmless.

Respondent argues that the only contested issue in Homer's murder defense was whether Homer possessed the requisite intent for murder, and that other evidence overwhelmingly proved that he had such an intent. Respondent is wrong on both counts.

---

10. Homer argues correctly that the pathologist's testimony was consistent with Homer's story: Marian could have eaten on the evening of November 20 and died on the morning of November 21 (within 8 hours or thereabouts of having eaten), which would then in turn fall within the 24 to 48 hour range of the autopsy on November 23—at least given the pathologist's testimony that he could only make a "rough determination" of the time of death (R. 535–36). In addition, Homer argues (P.R.Mem. 9–10):

> Moreover, even if this argument had been made at trial, it challenges the imagination to believe that twelve reasonable jurors concluded that Homer had bound and gagged Marian and loaded her, naked, into his car, and had then either spoonfed her in that position or untied her and taken her out to eat, before injecting her with a lethal dose of drugs and returning her bound, gagged, and naked, as before, to the trunk of the car. It is far more likely that the jury simply concluded either that the medical evidence was off by a few hours or that Marian had somehow eaten

during the night of November 20–21, before she died on the morning of the 21st.

Of course that is far from the only contention coming from either side in this lawsuit that challenges the imagination. Fortunately, as the following text shows, this Court need not now predict how the jury would have evaluated that evidence.

11. That conclusion is not at all at odds with Opinion I's conclusion (and Opinion II's concurrence with the conclusion) that the erroneous admission of the "Oh my God" statement was, by itself, harmless error. Indeed, one of the reasons this Court found that single statement harmless in the legal sense (Opinion I at 386–87) was because its presentation in the State's closing argument actually undercut the credibility of the version that Michael presented later—the version whose harmlessness this Court has now been asked to consider—and the State's Attorney portrayed it as a lie.

First, as Opinion I at 387 noted, the state presented numerous theories on which the jury could return a murder conviction, one of which was felony murder. There is of course no way to know whether the jury based its conviction on the state's felony-murder theory, but if it did this Court's determination as to the insupportability of the kidnapping and conspiracy convictions—the predicate felonies for any felony-murder theory—would require the murder conviction to be struck down as well. That should be enough to cast serious doubt on Homer's murder conviction.

Even if the jury did not rely on felony murder, however, respondent is wrong in saying that Michael's third statement contributed nothing to a potential finding that Homer had the requisite intent. Homer's defense was that his actions, rather than being taken with the intent to kill or injure Marian, were part of a misguided attempt to calm her down after she apparently suffered a violent epileptic seizure. Contrary to respondent's assertion (R.Mem. 4), perhaps the most damaging evidence suggesting that Homer's defense was trumped up was not what was said by Mary Ellen (who, after all, was not in a position to know whether Marian had a seizure or not), but rather what was *not* said by Michael at any point in his several statements. Although Michael gave a detailed statement to police about the events as they unfolded in that fatal basement, he never mentioned a seizure. Instead he said that the whole violent incident began when Marian resisted Homer's attempts to blindfold her while Michael, brandishing a gun, demanded she sign the house over to the children. Furthermore, Michael's statement that he and Homer had previously agreed to kidnap Marian has the unmistakable implication that their evil intent carried through to the later actions. Obviously the exclusion from evidence of those statements by Michael would eliminate the potential for the jury's drawing the kinds of inferences referred to in this paragraph.

■ Respondent basically asks this Court to find Homer's story so inherently implausible that no rational jury could find that things happened as Homer described. But that (in addition to its insupportability in factual terms) misreads the role of harmless error analysis in habeas corpus law: It asks this Court to do what the jury is supposed to do in the first instance—determine who is telling the truth. Federal habeas corpus is not designed to replace the judgments of state court juries with those of federal judges, but rather to insure that if one jury's verdict has been tainted by a demonstrated violation of the constitutional rights of the accused, the State is required to release him or retry him in front of another jury not so tainted. Where as here evidence was improperly admitted that cast material doubt on defendant's core theory of defense, it is inconceivable that a habeas court could cavalierly deny the writ simply because it disbelieved the defendant's story.

Respondent also puts too much emphasis on the fact that Homer told DiVito, "Blame it all on me. I did it, my son had nothing to do with it." R.Mem. 5 claims that statement proves Homer's intent to murder Marian. But respondent reaches that conclusion by truncating the statement, leaving off everything after "I did it." That changes the natural meaning of the statement from an attempt to exculpate Michael by urging police to blame Homer for any wrongdoing that might have occurred into an admission that what occurred was murder. This Court will not preempt the jury's function by ruling as a matter of law that a jury would hang that much importance on one possible reading of a single statement by Homer. Absent any other evidence that could possibly have borne on whether things transpired as Homer described them or instead as Michael did, it is impossible to say beyond a reasonable doubt that Michael's statement did not impact the jury's murder verdict.[12]

### Conclusion

There is no need for an evidentiary hearing. Considered collectively, the admission

---

**12.** This just-completed analysis has not treated with Homer's conviction and 3 to 10 year sen-

tence for aggravated battery. Neither party has said anything about that conviction or how Mi-

of all of Michael's statements in violation of *Bruton* was not harmless beyond a reasonable doubt. Homer is therefore entitled to have the writ of habeas corpus granted. His murder and aggravated kidnapping convictions must be vacated,[13] and as is mandated (for example) in *Williams v. Lane*, 826 F.2d 654, 668 (7th Cir.1987):

> Execution of the writ is stayed on condition that the State of Illinois grant petitioner a new trial on the [murder and aggravated kidnapping] charges within a reasonable time not to exceed ninety days, and diligently and without delay prosecute the charges to final conclusion.

## APPENDIX

With all due respect, this Court's initial reaction on receiving and reading the Court of Appeals' slip opinion in this case was one of puzzlement. This Court's recollection had been that only one aspect of an unredacted statement by Homer's son Michael, which had been admitted into evidence during their joint trial, had been focused on by Homer's highly competent appointed counsel[1] during the habeas proceedings before this Court—Michael's attribution to Homer of the statement:

> Oh my God, what have I done?

That sole focus was of course the reason for this Court's treatment of the issues in

Opinion I at 384–88—its analysis of that statement alone in "harmless error" terms, which was expressly found "persuasive" by the Court of Appeals in Opinion II at 243. If the issues had instead been framed in Homer's memoranda before this Court to encompass the much broader question that was later identified by the Court of Appeals in remanding the case and that has now been treated on the merits in this opinion, the entire history of the proceedings would have been different. This Court's analysis at that time, if the grist then expressly tendered for its mill had been the totality of Michael's pretrial statements rather than just the "Oh my God" quotation that he ascribed to Homer, would of course have been identical to the analysis that is now contained in the text of this opinion. Homer's petition for habeas corpus would have been granted, rather than denied, on harmless error grounds.

Hence after its reading of Opinion II this Court awaited the return of the record from the Court of Appeals with the earlier-described sense of puzzlement. Had memory played tricks? Had the briefing before this Court the first time around raised the broader issue but been missed by this Court? If so, why had there not been a motion to reconsider pointing that out to this Court?[2]

---

chael's statements may or may not have impacted it. Because Homer was convicted over 10 years ago, it would appear that the battery sentence has already run and that Homer would no longer be in custody on that conviction—a prerequisite for review under Section 2254. Accordingly, this opinion need not decide whether that conviction too was tainted.

**13.** It will be recalled that the Illinois trial court has already vacated the conspiracy conviction that this opinion has shown to have been constitutionally problematic.

**1.** Before this Court Homer was represented by Professor Marc Kadish ("Kadish") of IIT Chicago–Kent College of Law, assisted throughout by students at the law school. Because the proceedings extended over several semesters of the law school, that involved the use of different teams of assistants at different stages—more on this subject a bit later in this Appendix.

**2.** Motions to reconsider, not specifically contemplated anywhere in the Federal Rules of Civil Procedure but possessing a time-honored history in practice, are most frequently offered in an inappropriate way: by asking the court to revisit an issue that it has considered and dealt with thoroughly, but on which it has reached a conclusion adverse to the movant. This Court's favorite citation in the area is this quotation from the late Judge Dortch Warriner's opinion in *Above the Belt, Inc. v. Mel Bohannan Roofing Co.*, 99 F.R.D. 99, 101 (E.D.Va.1983):

> The motion to reconsider would be appropriate where, for example, the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court. Such problems rarely

Examination of the record on its return from the Court of Appeals disclosed that this Court's recollection had been accurate. Homer's extensive, well-presented and seemingly thorough briefing in this Court the first time around had followed its *Bruton* discussion with one complaint and one complaint only—the assertedly fatal effect of placing the "Oh my God" statement before the jury. That was the issue as posed, and that was the issue that Opinion I dealt with.

Here is what a run-through of the record before this Court, as incorporated in the Record on Appeal, reflects:

1. On November 17, 1986 Kadish as Homer's appointed counsel filed a 21–page Amended Petition for Writ of Habeas Corpus ("Petition"). It began with the *Bruton* issue (Petition at 4–9). But though it did refer at the outset to the introduction into evidence of Michael "statements," the only such statement that was referred to specifically (and on two occasions, Petition at 7 and 9) was the "Oh my God" statement by Homer about which Michael had told Officer Giovannelli. There was, however, also a reference (Petition at 8) to the impropriety of the trial court's having allowed into evidence Michael's statement to Assistant State's Attorney DiVito.

2. When the case then proceeded to the argument of legal issues, Kadish's 26–page February 18, 1987 Memorandum of Law on Homer's behalf, which was devoted to a number of issues besides *Bruton* (all of which were later treated and rejected by Opinion I, in turn affirmed on all those issues by Opinion II on the appeal), began with the *Bruton* issue framed in these terms (Mem. 3):

> The Motion for Severance was denied in light of the agreement that the admissions would be redacted and intro-

duced only to reflect only those admissions directly and specifically attributable to each co-defendant. (R.646) This agreement was violated when Michael's unredacted "confession" was introduced into evidence.

Michael's "confession" included an exculpatory statement in which he claimed to have overheard his father, Homer Hanrahan, exclaim: "Oh, my God, what have I done?" (T.323) Although this unsubstantiated hearsay evidence was allowed to stand, with only a limiting instruction from the court, it went unchallenged or unexplained. Michael Hanrahan did not testify and was, therefore, unavailable for cross-examination. Homer Hanrahan was thus denied the "greatest machine for truth ever invented."

There followed a three-page discussion of *Bruton* and the handling of that issue by the Illinois courts in Homer's case, then still another reference to the "Oh my God" statement as the sole focal point of the claimed constitutional violation. Indeed, the memorandum then made only one reference to any other statement by Michael, and that was included only to make the point that Michael's admission of *his* having struck his mother over her head interlocked with Homer's similar statement to DiVito—a point advanced solely to emphasize the contrast with the "Oh my God" statement, which counsel said was used to "shift the entire blame to Homer" (Mem. 7).

3. Respondent's 14-page Memorandum did not deal at all with the *Bruton* question on the merits, instead urging waiver and (more briefly) lack of prejudice.

4. Kadish's April 22, 1987 Reply Memorandum again said only this as to the challenged statement (R.Mem. 5, 6):

arise and the motion to reconsider should be equally rare.

That statement has its counterpart in Fed.R. App.P. 40(a), which requires every petition for rehearing before a Court of Appeals to "state with particularity the points of law or fact which in the opinion of the petitioner the court

has overlooked or misapprehended...." In this instance the scenario assumed in the text—*if* the facts had borne it out—would have been a classic instance of a *proper* use of such a motion: this Court's misapprehension of the issues, with a consequent failure to treat them fully.

Homer Hanrahan was convicted of murder. Michael Hanrahan was convicted of aggravated kidnapping and aggravated battery. Petitioner contends that the different convictions and the jury's reluctance to consider his actions to amount to a lesser crime, such as involuntary manslaughter, are the result of the introduction, contrary to a pre-trial agreement, of Michael's unchallenged statement that he heard his father say: "Oh, my God what have I done."

\*     \*     \*     \*     \*     \*

Homer's theory of the case, then, is not that he tried to kill his wife, but that he tried to keep her alive. Thus, the statement, "Oh, my God, what have I done," could be damning if left unchallenged and unexplained—as it was—since Michael never testified at trial and could not be cross-examined. There then followed six pages of legal argument as to the operation of the *Bruton* doctrine, addressing *that statement alone.*

5. When the parties' briefing had thus been completed, this Court sua sponte drew the parties' attention to then-newly-decided *Cruz v. New York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987)—handed down just one day before Kadish's filing of his Reply Memorandum. This Court directed the parties to address the potential applicability of *Cruz* to this case. And in doing so, once again Kadish argued *only* the "Oh my God" statement: Not just once, but in four places, the Supplemental Memorandum spoke of that statement and that statement alone in characterizing the alleged constitutional violations (Supp. Mem. 2–3, 5, 7, 9–10).[3]

6. On December 22, 1987 (a date mistakenly reflected as December 22, 1986 in the court reporter's transcript) this Court again called counsel into court sua sponte, this time to ask that they address the *Cruz* harmless error question as it related to the murder charge not only in conventional

terms but also as to such possible predicates as felony murder to explain the jury's guilty verdict. Again the only challenged statement identified in that colloquy was the "Oh my God" statement (Tr. 2):

THE COURT: Counsel, I appreciate your coming in. My reason for wanting you to do that is that when my clerk got well into the preparation of the initial draft for an opinion in connection with what we had viewed as a fully briefed motion, one issue emerged that really neither party had dealt with, and that's the reason that I wanted to call it to the attention of both of you. And that's this: As you know from the communication that I had sent you about what the standard now is—

MR. KADISH: Right.

THE COURT: —that is, the harmless error issue (the Cruz-type issue), what has to be looked at from the harmless error perspective is whether the challenged statement by the son— the "Oh, my God. What have I done?"—

MR. KADISH: That's right.

THE COURT: —statement that he attributed to his father created—if erroneously admitted, was done in a harmless sense for legal purposes.

"That's right," the response from Homer's lawyer Kadish, was of course in total accord with his own uniform and unvarying approach to the problem.

7. At that point the parties then filed their further supplemental (and final) memoranda, responding to this Court's additional request. And for the first time in any of his several memoranda Kadish made a sidelong one-sentence reference to something other than the "Oh my God" statement. His February 18, 1988 Supplemental Memorandum dropped this footnote into the "Introduction" subsection of the "harmless error" discussion:

Although every inculpatory statement made by Michael Hanrahan against Petitioner may be considered a separate

---

3. Those four references were of course separated by argument on the case law.

violation of Petitioner's Confrontation Clause right, this Memorandum will focus only upon the statement specified for consideration by the Court— "Oh, my God, what have I done?"[4] That then made up the relevant record before this Court and then the Court of Appeals. Although this Court has not also had reference to the parties' briefs on appeal, such briefs do not of course form part of the Record on Appeal as sent to the Court of Appeals and then returned here on remand.

But from the record itself, as just outlined in detail, this Court has considerable difficulty in identifying the situation as the one discussed in these terms by Opinion II at 243–44:

> This treatment [in *Opinion I* at 385–88] of the "Oh, my God" statement is persuasive. Homer insists, however, that this statement is the least of his worries, that his principal objections were directed to Michael's extensive narrations of the kidnapping plan, the battery in the basement, and Homer's use of drugs despite the absence of a seizure. Coming from his own son, who had been linked to the events by Mary Ellen's independent evidence, they must have doomed Homer's defense. None of these did the district court discuss. At oral argument counsel for the state conceded that objections to the use of these statements were raised and preserved in state court and properly presented in the petition for a writ of habeas corpus. Although Homer's lawyer suggests that in retrospect the brief may have put too much weight on the vivid "Oh, my God" exclamation, counsel for the state does not maintain

that by concentrating on one statement Homer forfeited his right to review of the effects of the others.

To be sure, there is no doubt that the questions as to Michael's other statements were raised and preserved in the *state* courts. And it may also perhaps be literally true that one of the other statements was "properly presented in the petition for a writ of habeas corpus." But what is unquestionable from the record is that nothing except for the "Oh my God" statement was *ever* argued before this Court in the numerous memoranda with which it had to deal in its decision reported as Opinion I.

Appellate courts regularly (and of course properly) limit the issues that an appellant may raise. Matters not raised in the briefs may not be presented for the first time in the course of oral argument. Even more fundamentally, matters not raised in the lower court may not be the basis for seeking reversal from a higher court. It is hardly necessary to rehearse the sound reasons for such principles, which do not stem from a mere concern for judicial convenience.

Liberty is at stake in this case, and this Court has no quarrel with the idea that some special rules ought to operate in favor of the convicted felon who is serving time on what may have been an unconstitutional conviction. But the irony of such a holding in this case is that the tide of decision has been running (and continues to run) so decisively in precisely the opposite direction. *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) and the several offspring it has already engendered in its brief lifespan[5] are only the

---

**4.** [Footnote by this Court] As indicated earlier, Professor Kadish typically draws on his law school students as resource persons to assist him in his pro bono appointment matters. That is to be sure entirely appropriate, as well as often providing useful insights to the court as well as to Kadish himself. But in this instance a new crew of student legal interns had come on board without having been at all involved in the earlier work on the case. When such a changing of the guard takes place, especially among law students who are likely to be less mindful of the kinds of procedural restraints

that are adverted to in this Appendix, it is frankly troublesome to find that kind of oh-by-the-way "reservation" of a legal position in light of all that had gone before.

**5.** See *Penry v. Lynaugh*, — U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), *Butler v. McKellar*, — U.S. ——, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990), *Saffle v. Parks*, — U.S. ——, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990) and *Sawyer v. Smith*, — U.S. ——, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990).

most recent manifestations of that development. Anyone who has followed the trend of federal habeas corpus in (say) the past 10 to 15 years [6] knows all too well that it has been an increasingly unavailable remedy.[7]

It is plain that Homer does not really fall into the category of those convicted defendants who are "probably ... actually innocent," a category that *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986) lists as a justified "fundamental miscarriage of justice" exception to the increasingly strict limitations on decisions by federal courts finding state convictions constitutionally tainted. After all, the decision reached in this opinion is not that a clearly *innocent* man has been convicted, but the far different one that the State has not shown beyond a reasonable doubt that constitutionally tainted evidence *did not* contribute to Homer's conviction. Maybe he deserves to be a special case, maybe not. But both candor and fairness would seem to have required at least an acknowledgement by the Court of Appeals that the legal effect of Michael's other statements, the issue leading to the remand, had not been fairly tendered to this Court for decision—not a bare statement that "None of these did the district court discuss" (Opinion II at 243).[8]

---

6. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) may not be the watershed, but it is a convenient reference point.

7. As chance would have it, this Court was invited by the Federal Judicial Center this year to lecture to the latest group of some 30 newly-appointed district judges on the subject of federal habeas corpus. In preparation for that hour-long lecture, it had occasion to revisit the familiar landmarks in the area.

8. After this opinion was written, this Court was advised that the characterization of Michael's other statements as having been raised before this Court, but left undiscussed, was attributable to counsel who argued the case for respondent on appeal—and not to the Court of Appeals. Certainly that Court cannot be faulted for having accepted such a characterization and concession, as erroneous as this Appendix has demonstrated it to be.