**Homer E. HANRAHAN,
Petitioner–Appellant,**

v.

**James GREER, Warden, Menard Correctional Center, Respondent–Appellee.**

No. 88–2927.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 15, 1989.

Decided Feb. 20, 1990.

242

Cynthia Grant Bowman, Chicago, Ill., for petitioner-appellant.

Mark L. Rotert, Jack Donatelli, Asst. Attys. Gen., Office of the Atty. Gen., Crim. Appeals Div., Chicago, Ill., for respondent-appellee.

Before CUDAHY, EASTERBROOK, and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Marian Hanrahan died at the hands of her estranged husband Homer and her son Michael. Both maintained that Marian's death was accidental. The jury found Homer guilty of murder; it acquitted Michael of murder but convicted him of kidnapping and aggravated battery. State courts rejected their challenges on direct appeal, *People v. Hanrahan*, 64 Ill.App.3d 207, 20 Ill.Dec. 866, 380 N.E.2d 1075 (1st Dist. 1978), and on collateral attack, 132 Ill. App.3d 640, 87 Ill.Dec. 892, 478 N.E.2d 31 (1st Dist.1985). Homer's federal petitions for collateral relief also have come to grief: first because of incomplete exhaustion of state remedies, *Hanrahan v. Bosse*, 547 F.Supp. 721 (N.D.Ill.1982), and now partly on grounds of forfeiture and partly on a finding of harmless error, *Hanrahan v. Thieret*, 695 F.Supp. 372 (N.D.Ill.1988). His luck is about to change, because although he waived in state court most claims potentially available, the state has waived in federal court most of its defenses to his claims.

Script writers must look elsewhere for material; this is too gruesome for prime time TV. Homer and Marian were separated, and a state court had forbidden Homer to visit Marian. Nonetheless he showed up at her house on November 20, 1974—according to him to discuss calculation of child support payments, according to the state to kidnap her until she signed the house over to their children. Homer dismissed the children and took Marian to the basement.

According to Homer, Marian, an epileptic, had a seizure. Homer, a pharmaceutical salesman, injected her with Sparine, a drug he had used before to calm her. She continued writhing during the seizure, and she bumped her head on a post. Homer took the unconscious Marian upstairs to bed. He did not seek medical aid, expecting Marian to be all right in the morning. Next morning Homer discovered she was dead. Terrified, Homer and Michael trundled her into the trunk of the car. Homer

left a note for Mary Ellen, their 16 year old daughter, that he and Marian were going on vacation. Mary Ellen did not believe that her mother would leave without saying goodbye—let alone accompany Homer—and went to the police. The next day the police found Homer and his car at his girlfriend's house. Marian's body was in the trunk.

Such is Homer's tale; the state's evidence makes things look worse. Before visiting Marian, Homer met with Michael, a college student, to discuss kidnapping Marian and presented him with a gun. Michael turned the gun on Marian in the basement and demanded a deed to the house. She refused. Mary Ellen heard a heated argument between her parents. Homer tried to truss Marian up and blindfold her. She resisted and kicked Michael in the groin; he responded by pistol-whipping her. Mary Ellen heard her mother scream and whimper "It hurts, it hurts." Blows from the gun knocked her unconscious and caused her to bleed profusely. When Homer took Marian to bed, his hands were covered with blood. Homer and Michael put their clothes in the washing machine to wash away the blood but had no greater success than Lady Macbeth; Mary Ellen saw Michael dressed only in undershorts with blood on them. When Homer lowered Marian, bound and gagged, into the trunk the next morning, Michael heard something like a moan.

Police found the sheets of Marian's bed soaked with blood. A hole had been cut in her slacks; needle marks were found in her buttocks and anus. Sparine was not the only drug she received. She died of morphine intoxication. The coroner also found Sparine, chloroform, alcohol, and barbiturates in her bile. Wounds were secondary causes. Homer expressed bewilderment about the presence of morphine.

Much of the state's case came from Mary Ellen, from the physical evidence, and from Homer's own mouth. Some of it came from Michael. In a series of inconsistent statements to the police, Michael described a kidnapping plot in which he took part, narrated a brutal encounter between his father and his mother in which he was a bystander, and denied complicity. Here lies the difficulty. Michael did not testify. Homer and Michael moved for separate trials; the court denied the motion. The prosecutor then introduced Michael's statements, including the references to Homer, into evidence against Michael. At the time of the trial, Illinois and the federal courts generally permitted this, despite *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), when the defendants gave "interlocking" confessions, a practice that evenly divided the Supreme Court in *Parker v. Randolph*, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979). *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), broke the tie against the "interlocking confessions" doctrine, setting the stage for Homer's principal arguments in support of collateral relief.

The district court's opinion focused on a single statement: Michael's declaration that as Homer stood over an inert Marian in the basement, Homer gasped: "Oh, my God, what have I done?" Although the admission of this statement at a joint trial was unconstitutional in light of *Cruz*, the district court thought the error harmless beyond a reasonable doubt because it tended to support Homer's position at the expense of the prosecution's. An exclamation of surprise (perhaps grief) suggests accident; the state was trying to show murder. Moreover, Homer testified and admitted making a statement of this kind. Similar evidence via Michael could not have injured his case, the court held. 695 F.Supp. at 385–88.

This treatment of the "Oh, my God" statement is persuasive. Homer insists, however, that this statement is the least of his worries, that his principal objections were directed to Michael's extensive narrations of the kidnapping plan, the battery in the basement, and Homer's use of drugs despite the absence of a seizure. Coming from his own son, who had been linked to the events by Mary Ellen's independent evidence, they must have doomed Homer's defense. None of these did the district court discuss. At oral argument counsel for the state conceded that objections to

the use of these statements were raised and preserved in state court and properly presented in the petition for a writ of habeas corpus. Although Homer's lawyer suggests that in retrospect the brief may have put too much weight on the vivid "Oh, my God" exclamation, counsel for the state does not maintain that by concentrating on one statement Homer forfeited his right to review of the effects of the others.

Despite conceding that Homer has preserved *Bruton* objections to all of Michael's statements implicating him, and that the use of these statements violates the Constitution as *Cruz* interpreted it, the prosecutor asks us to affirm. To the extent the state insists that the use of *all* of the statements was harmless beyond a reasonable doubt, it is in the wrong court. Decisions on harmless error, as on other questions involving the fact-specific implementation of legal rules, *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928 (7th Cir.1989) (en banc), are for the district judge in the first instance.

Although the judge reviews the record of the state case, and some appellate courts take that as a cue for *de novo* appellate decision-making, e.g., *Gunn v. Newsome*, 881 F.2d 949, 964 (11th Cir.1989), the Supreme Court has established that district judges have the leading role in "paper cases" no less than when assessing the credibility of testimony. *Anderson v. Bessemer City*, 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985); see also *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986) (appellate court should not act even on basis of undisputed facts, when characterization of those facts could be doubted); *United States v. Rodriguez*, 888 F.2d 519, 521–22 (7th Cir.1989) (that district judge reviews magistrate's recommendations on paper record does not authorize *de novo* appellate review). Our court has never focused on the question whether review of decisions concerning harmless error should be deferential. Some cases appear to engage in *de novo* review, *United States ex rel. Lee v. Flannigan*, 884 F.2d 945, 950–51 (7th Cir.1989), while others are silent, e.g., *Burns v. Clusen*, 798 F.2d 931, 943–45 (7th Cir.1986). Deferential review is more consonant with principles that govern the ordinary roles of district and appellate judges. But we need not decide a question that has not been briefed, and which is not dispositive in a case that has yet to receive an initial decision from the district judge.

The state maintains, though, that we could avoid remand by holding that on collateral attack the defendant, rather than the state, bears the burden. More, the state contends, the prisoner's burden should be to show that the error affected substantial rights. If this is Homer's task, the state believes, the standard of review could not make the difference. Perhaps harmless error rules should be different on direct and collateral review. One judge of this court so argued in *United States ex rel. Miller v. Greer*, 789 F.2d 438, 448–56 (7th Cir.1986) (en banc) (dissenting opinion). The Supreme Court granted review to decide whether to use a different standard on collateral review but ducked by holding that there was no violation. *Greer v. Miller*, 483 U.S. 756, 761 n. 3, 107 S.Ct. 3102, 3106 n. 3, 97 L.Ed.2d 618 (1987). Justice Stevens filed a concurring opinion supporting a different standard, 483 U.S. at 767–69, 107 S.Ct. at 3110–11 (concurring opinion), but his colleagues preferred to await another day—which has not dawned. The state wants us to bite the bullet in this case, but we decline the invitation for three reasons.

First, the state did not make this argument in the district court and so has not preserved it for appellate decision. Illinois, which took *Miller* to the Supreme Court, is hardly in a position to treat the possibility of a special harmless error rule on collateral attack as a novel argument. Second, it is not clear to us that the state would do any better under a "substantial right" approach with Homer bearing the burden than it is likely to do under a "reasonable doubt" approach. Third, both judges who argued in support of different standards in *Miller* concluded that the stringent "reasonable doubt" standard should be employed on collateral attack when the error is fundamental and degrades the truth-find-

ing function of a trial. *Bruton* errors increase the probability that innocent persons will be found guilty and therefore are weak candidates for a more accommodating harmless error rule.

*Bruton* was a novelty and *Cruz* a close case even given *Bruton.* The standard response to novel decisions that receive unanticipated extensions is not a change in the harmless error rule but prospective operation. After *Teague v. Lane,* —— U.S. ——, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), new constitutional decisions apply automatically to cases on direct appeal but apply on collateral attack only if they establish categories of conduct that states may not call criminal or create "watershed" rules protecting the innocent, *id.* 109 S.Ct. at 1075. Homer's direct appeals ended in 1979, long before *Cruz,* so the prosecutor asks us to hold that the conviction is now beyond challenge. If we were to apply *Teague* we would need to ask what the law was at the time of Homer's trial (recall that it preceded *Parker* ) and whether *Cruz* changed the governing rules as opposed to rejecting an effort to carve an exception out of *Bruton.*

■ We needn't do this, however, because the state did not preserve an objection to the retroactive application of *Cruz.* After *Cruz* came down, the district judge called for briefs on its effects. The state tackled the merits without suggesting that *Cruz* should not be applied to Homer's case. Although it filed this response before the Court decided *Teague,* that is neither explanation nor excuse. Disputes about the retroactive application of constitutional decisions have pervaded criminal procedure over the last 25 years. *Teague* adopted the position Justice Harlan espoused in *Mackey v. United States,* 401 U.S. 667, 675, 91 S.Ct. 1160, 1164, 28 L.Ed.2d 404 (1971) (dissenting opinion), which in recent years had gathered the support of a majority of the Justices— though never before *Teague* in the same case on a collateral attack. (*Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), adopted Justice Harlan's position for cases on direct appeal.) Prosecutors had been pumping for Justice Harlan's position for years. Not phrasing an objection to retroactivity in the precise terms the Court adopted in *Teague* is one thing; not phrasing *any* objection to retroactivity is another.

Although in *Teague* the Court raised the retroactivity question on its own, our case is different for two reasons. First, there had been a practice of applying a novel constitutional rule to the case establishing that rule, 109 S.Ct. at 1069, and asking the retroactivity question later. *Teague* changed that practice. Had Teague prevailed on the merits, his would have been the vanguard case for a new rule, so it is understandable that the state did not object to the application of the rule to Teague himself, although the state had objected to the retroactive application to Teague of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Second, the district judge called for briefs on the effect of *Cruz,* which would have been the orderly time to object to its application. So although a court may consider retroactivity questions that the parties did not present, 109 S.Ct. at 1069, Illinois has missed the boat.

This wraps up our discussion of the *Bruton–Cruz* problem. The district court should determine whether Michael's statements collectively were harmless. Homer presents two further grounds in support of collateral relief. With respect to one—that the prosecutor served as a "witness" against him at trial—we agree with the conclusions of the district judge. 695 F.Supp. at 391–94. The other need not detain us much longer.

■ Judge Wayne Olson of the Circuit Court of Cook County presided over the pretrial proceedings against Homer and Michael. Olson has been convicted of accepting bribes and is in federal prison. *United States v. Olson,* 830 F.2d 195 (7th Cir.1987) (unpublished memorandum affirming conviction). See *Messinger v. United States,* 872 F.2d 217 (7th Cir.1989), and *United States v. Roth,* 860 F.2d 1382 (7th Cir. 1988), for descriptions of some of Olson's escapades. Homer contends that Olson attempted to extort $40,000 from him, and that when he would not pay Olson made unfavorable rulings, including denying the motion for severance. Homer forfeited ar-

guments based on the extortion when he did not present them to the state courts. *Branion v. Gramly,* 855 F.2d 1256, 1266–68 (7th Cir.1988). He says that he would not have been believed; perhaps, but he had to try. Maybe he *should* not be believed; not every claim of extortion is true. Judicial corruption is in the news these days, but claims of extortion would not have been sure to boomerang in Illinois in the 1970s. After all, two of the seven justices of the Supreme Court of Illinois resigned in 1969 after the Illinois Courts Commission concluded that they had accepted bribes. See Charles R. Ashman, *The Finest Judges Money Can Buy* 195–200 (1973). This leaves Homer to seek the shelter of the "fundamental miscarriage of justice" exception to the forfeiture rules. *Murray v. Carrier,* 477 U.S. 478, 495–96, 106 S.Ct. 2639, 2649–50, 91 L.Ed.2d 397 (1986). Nothing in this record shows a miscarriage of justice, however. Olson did not preside at trial. His replacement could have severed the cases in response to a renewed motion. (Expunging Michael's statements of all references to Homer or trying to disguise the identity of the person to whom Michael referred would have been futile.) Homer presents no reason to doubt the integrity of the judge who conducted his trial.

VACATED AND REMANDED