**Homer E. HANRAHAN,
Petitioner–Appellee,**

v.

**James H. THIERET, Warden,
Respondent–Appellant.**

**No. 90–3292.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 14, 1991.

Decided May 29, 1991.

Rehearing and Rehearing In Banc Denied
Aug. 12, 1991.

Cynthia Grant Bowman, Northwestern University Legal Clinic, Chicago, Ill., for petitioner-appellee.

Marcia L. Friedl, Asst. Atty. Gen., Neil F. Hartigan, Atty. Gen., Bradley P. Halloran, Office of the Atty. Gen., and Terence M. Madsen, Asst. Atty. Gen., Office of the Atty. Gen., Crim. Appeals Div., Chicago, Ill., for respondent-appellant.

Before WOOD, Jr., and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

Sometime near midnight on November 21, 1974, Mary Ellen Hanrahan, the sixteen-year-old daughter of Homer Hanrahan, went to the Niles police station. Her mother was gone, she told police officers, and she was worried. Her report led to the arrest of her nineteen-year-old brother, Michael Hanrahan. It also led to the arrest of her father and the discovery of her mother's dead body in the trunk of his car. Both men were charged with murder, aggravated kidnapping, aggravated battery, and conspiracy. After a joint trial, a jury convicted Homer on all counts and Michael on all counts but murder.

Homer thereafter began a lengthy process of challenging his convictions on direct

appeal [1] as well as collaterally.[2] This court first addressed these efforts in *Hanrahan v. Greer*, 896 F.2d 241 (7th Cir.1990), where we upheld the district court's conclusion that Homer's constitutional rights had been violated by the admission of incriminating statements by his son and nontestifying codefendant, Michael. We remanded the case, however, so that the district court could determine whether the admission of Michael's statements collectively constituted harmless error. That determination having been made in favor of Homer, *see United States ex. rel. Hanrahan v. Thieret*, 748 F.Supp. 603 (N.D.Ill.1990), we have occasion to revisit his petition on this appeal by his prosecutor.

### I.

Familiarity with the previous opinions addressing Homer's efforts is assumed, but the nature of our inquiry demands a factual presentation. Crudely, but necessarily, summarized, the relevant testimony falls within four major categories: (1) Mary Ellen's testimony; (2) physical evidence; (3) Homer's statements and testimony at trial; and (4) Michael's statements.[3]

#### A. *Mary Ellen's Testimony*

Mary Ellen testified that she arrived at her home in Niles, Illinois, at approximately 9:30 p.m. on November 20, 1974. She was met by her father, which she thought unusual for two reasons. First, her father and mother were in the process of getting divorced and he no longer resided in the family home. Second, blood covered his right forearm, which he attributed to having cut himself.

At her father's behest, Mary Ellen went upstairs to her room. Once there, she was startled when she heard her mother, Marian Hanrahan, scream. Homer soon came upstairs and explained that Michael and Marian were fighting, but this explanation failed to satisfy Mary Ellen's curiosity. After her father left, she eavesdropped at an air vent that led to the basement. She heard her mother moan and also heard her mother say, "It hurts, it hurts."

The results of her eavesdropping prompted Mary Ellen to go downstairs to the kitchen. Homer soon came up from the basement and again told her that Michael and Marian were arguing downstairs. Things had gotten out of hand, he said, but they were okay now. Mary Ellen went back to her bedroom but continued to hear her mother moaning.

When Mary Ellen's uncle brought her brother Steven back home from a birthday party, she went downstairs and saw Michael greet the uncle at the front door wearing only his undershorts. After the uncle departed, she asked Michael what was wrong. He replied that their mother had gone "crazy" and that he had hit her in the face after she came at him with a knife. Michael then refused to allow Mary Ellen to go down to the basement to see their mother.

After her encounter with Michael, Mary Ellen returned to her bedroom. She was not to remain there, however; she later came back downstairs to the kitchen and once again encountered her father. They had a conversation in which Homer asked

---

**1.** *See People v. Hanrahan*, 64 Ill.App.3d 207, 380 N.E.2d 1075, 20 Ill.Dec. 866 (1st Dist.1978), *cert. denied*, 444 U.S. 828, 100 S.Ct. 53, 62 L.Ed.2d 36 (1979).

**2.** *See United States ex rel. Hanrahan v. Bosse*, 547 F.Supp. 721 (N.D.Ill.1982), *aff'd by unpublished opinion*, 723 F.2d 67 (7th Cir.1983); *People v. Hanrahan*, 132 Ill.App.3d 640, 478 N.E.2d 31, 87 Ill.Dec. 892 (1st Dist.), *appeal denied*, 108 Ill.2d 579 (1985); *United States ex rel. Hanrahan v. Thieret*, 695 F.Supp. 372 (N.D.Ill.1988).

The state trial court vacated the conspiracy charge at the sentencing hearing and the three-to ten-year sentence for aggravated battery has already been served. Thus, only the convictions

for aggravated kidnapping and murder remain candidates for habeas corpus relief.

**3.** These categories derive from our first encounter with Homer's petition. *See* 896 F.2d at 243. We have borrowed wholesale from the exposition of facts by the district court, 748 F.Supp. at 604–08, which in turn relied heavily on the statement of facts in an Illinois appellate court opinion. *See id.* at 604 n. 5; *see also* 64 Ill. App.3d 207, 380 N.E.2d 1075, 20 Ill.Dec. 866. The state court opinion did not specifically address the issue of harmless error, however, and the district court, as well as this court, have at times found it necessary to supplement that opinion's otherwise thorough descriptions.

her how she would feel about the possibility of his reconciliation with her mother.

Mary Ellen thereafter returned to her bedroom, fell asleep, and did not awaken until roughly 7:00 a.m., when she heard Michael leaving for school. After her father came into her room and told her to get ready for school, Mary Ellen asked to see her mother. Homer refused. He assured her, however, that everything was alright and that her mother was still sleeping.

When Mary Ellen returned from school around 2:15 p.m., she found a note from her father stating that he and her mother had gone on a trip and would return in a few days. She thought it unusual that her mother would leave without saying goodbye. She also thought it unusual that her mother would go anywhere with her father. Acting on her concerns, she went to the police and told them what had happened.

### B. *Physical Evidence*

After Mary Ellen related these events, police officers accompanied her to the family home. In the basement, they discovered blood and observed that the floor had been freshly mopped. They also found a blood-stained mattress pad on Marian's bed and noticed that the sheets and covers were missing. After checking her mother's closet, Mary Ellen found that none of her mother's clothes were missing.

Michael was arrested for battery later that morning, November 22, 1974. That evening, police officers arrested Homer at the home of Roberta Stiles, his girlfriend. When they opened the trunk of his car, they found Marian's naked dead body inside. They also found Marian's purse, some hypodermic syringes, various drugs, a drug salesperson's sample kit with empty slots, a bottle labelled chloroform, a paper towel shaped into a cup, a suitcase that contained a hunting knife, boxes with medication labels, and a vibrator. In addition to the contents of the trunk, the state was also successful in admitting into evidence two handguns that were in Stiles's home, one of which had traces of blood on the

butt; sheets, towels, and blankets from the family home that were discovered in Stiles's basement; an attache case from the back seat of Homer's car; and blood-stained clothing belonging to Michael and Homer.

In relaying the results of his initial examination, the pathologist described the bruises that were evident on the side, shoulder, and head of Marian's body. He testified that a bruise on Marian's forehead, which had caused internal bleeding, was consistent with a blow to the head. That blow could have caused external bleeding from her nose, head, ears, or mouth, but the pathologist did not observe any signs of external bleeding from those areas. He also described Marian's anus as dilated and indicated that her buttocks evidenced multiple puncture wounds that were consistent with needle injections.

On the basis of this initial examination, the pathologist determined that Marian's numerous bruises had caused her death. When he received the toxicologist's report, however, he revised that determination. Marian, he told the jury, died of acute morphine intoxication; the external wounds were at most a contributing cause of death. She had died twenty-four to forty-eight hours prior to her autopsy on the morning of November 23, and she had eaten approximately four to six hours before her death.

The toxicologist's analysis of Marian's blood, urine, and bile revealed a toxic level of morphine; nonlethal doses of a tranquilizer and barbiturates; a negligible amount of alcohol; and a trace amount of chloroform. Of the drugs that the police recovered, only one could have been the source of the morphine that killed Marian—the cough medicine Phenargan, which contained codeine. If that were the only source, however, Marian would have had to ingest five to ten of the little sample bottles that the police discovered.

### C. *Homer's Statement and Testimony*

Homer's first and only statement came several hours after his arrest.[4] He revealed the location of two guns and also

---

**4.** This statement was made shortly after Michael gave his third statement.

revealed the location of the blankets, towels, bandages, drugs, hypodermic needles, and Marian's clothing.[5] He admitted that he had attempted to administer Sparine, a tranquilizer, into his wife's anus and that he had successfully injected it into her buttocks. He also identified chloroform as another substance used, and admitted a familiarity with drugs as a result of his former employment as a salesperson for a pharmaceutical company.

Homer's statement also included references to Michael's participation. He told the assistant state's attorney that Michael struck Marian in the head with a gun after she displayed a serrated knife. He also stated that Michael administered chloroform to Marian. In seeming contrast to these statements, however, Homer told his interviewer, "Blame it all on me, I did it, my son was not involved." The interview terminated after he requested an attorney.[6]

Homer also testified at trial. He told the jury that on November 20, 1974, he met Michael for dinner at Jake's Restaurant prior to a prearranged meeting with Marian to work out some of the details in their pending divorce. During his dinner with Michael, Homer expressed a desire to settle the matter that evening. If a quick settlement was not possible, however, then Homer indicated that he would like to get Marian "away from the influence of her family for a few days" in order to facilitate settlement.[7] The two men, who were both gun enthusiasts, also discussed a broken gun that Homer had left behind in the basement of the family home. Homer told Michael that he would give him the gun later that evening because Michael had an idea as to where to obtain a part to fix it.

After dinner, Homer and Michael proceeded separately to the family home, and on the way Homer stopped to cash a check and purchase beer. When he arrived, he noted that Marian's eyes and her walk appeared "funny." Homer told the jury that Marian was an epileptic and that she occasionally had seizures. He also testified that during these occasions Marian was in the habit of using the tranquilizer Sparine, samples of which he had received for distribution to doctors while working as a drug salesperson. Some of these samples were located in an old sample kit that he had left behind in the basement of the family home.

Homer and Marian proceeded to the basement, where they began sorting certain bills that he had paid and wanted credited toward his child support payments. As Marian was walking to a filing cabinet, she collapsed on the floor and began yelling and screaming incoherently. When Homer tried to help her to her feet, she pushed him away. She stood up on her own effort, knocking down a metal table in the process, and ran around the basement. She also managed to obtain a knife during this time and she began to come at Homer, knocking over yet another metal table. Some sort of struggle ensued, during which she cut Homer's hand.

In the middle of this altercation, Michael entered the basement and attempted to separate his parents.[8] Homer described Marian as "running around in circles, hanging on to this post with one hand and lunging at me trying to hit me, lunging at

---

5. As noted before, the police located most of this material and it was admitted at trial. The police were unable, however, to locate Marian's clothing.

6. Homer testified that he had believed his interviewer to be an attorney appointed to act on his behalf. When he discovered that the attorney was in fact a representative of the State, he refused to speak further.

7. Trial Transcript at 1014. The following colloquy also occurred at this point in Homer's testimony:

Q: Have you ever discussed getting your wife away from her family with anyone else?
A: Yes, sir.
Q: With whom?
A: My divorce attorney.
Q: And who was that?
A: Samuel Segal.
Q: And what did you suggest to him?
A: Well, I made that remark to him.
Q: What did he say to you?
A: He told me not to be foolish.
Q: Why did he say that?
A: It would serve no purpose, but get you in more trouble. It would be no point in it.
*Id.* at 1015–16.

8. Homer did not recall whether Michael carried a gun.

me with this knife, and of course, Mike was trying to stop everything at this point, and she kicked Michael." Trial Transcript at 1031. Michael went down on the floor and Marian fell back and hit her head against the post, causing her to fall to the floor semiconscious.

Homer went up to the kitchen to find towels so that he could clean up the blood that had splattered about. He also grabbed some ice cubes for Marian's head. When he returned to the basement, Michael suggested that they call a doctor. Homer rejected the idea, however. He was afraid that Marian would blame him for her injuries and that he would be arrested.[9]

Mary Ellen had since arrived home and been sent to bed. Homer did not want his daughter to hear her mother moan so he retrieved some of the Sparine samples from the kit that he had left in the basement. He cut a slit in Marian's slacks and attempted to administer the Sparine rectally. When several attempts failed, however, he injected a quantity of the drug directly into her buttocks, in the process bending a hypodermic needle.[10] Marian continued to moan during the period in which the drug had not fully taken effect. She also said something about hurting. Homer and Michael continued efforts to clean up the mess and also removed their blood-stained clothes and threw them in the washing machine.

At approximately 10:15 p.m., Homer's brother-in-law telephoned to say that he was bringing Steven home. Fearful of being discovered, Homer covered Marian's mouth with "industrial tape" and gave her another injection of Sparine to keep her from moaning. He also sent Michael upstairs to meet the brother-in-law, Michael's and Mary Ellen's uncle.

Later, after Mary Ellen and Steven went to sleep, Homer and Michael carried Marian to her bedroom. Michael again recommended that they call a doctor and Homer again refused. He assured Michael that Marian would be fine after she "slept it off." After Michael left the room, Homer undressed his wife and pulled the covers over her.

The next morning, after Michael, Mary Ellen, and Steven had left for school, Homer attempted unsuccessfully to wake Marian. She was dead. Panicking, he decided to remove her body from the house so that the children would not have to see her in that state. He was also afraid that he would be blamed for her death. In attempting to lift Marian's body from the bed, however, he discovered that she was quite heavy and that her arms and legs would not cooperate with his efforts to move her. He told the jury that he found it necessary to bind her arms and legs in order to facilitate her eventual removal from the room.

When Michael came home unexpectedly around 10:30 a.m., Homer informed him that his mother was dead. The two men then wrapped Marian in her bedding, carried her to the garage, and placed her in the trunk of Homer's car. Homer contin-

---

9. The following excerpt from Homer's testimony elaborates upon this fear:
   Q: And what do you mean, she was going to blame you?
   A: Well, with the divorce proceedings lasting as long as they had, we had so many other confrontations that I just knew that she was going to say that whatever happened to her was my fault.
   Q: What was your feeling that if you called the doctor at that time would happen to you?
   A: I would wind up in jail.
   Q: In the divorce proceedings that you and your wife had going at the time, did you have any orders against you probhiting [sic] you from striking, harassing her, interfering with her actions, or molesting her?
   A: Yes, sir.

Q: And was there an injunction on you at that time, issued on you, is that correct?
A: Yes, sir.
Q: And had your wife during the divorce proceedings sought to have you held in contempt of court for any reason during the divorce proceedings?
A: Yes, sir.
Q: And how many times was that?
A: Two or three.
Trial Transcript at 1035–36.

10. Homer expressed bewilderment as to how the morphine got in Marian's body. He also stated that neither he nor Michael had used chloroform and that the chloroform found in his automobile had been purchased as a cleaning solvent for use in his plumbing business.

ued to straighten up the house from the night before and picked up, among other things, some of the drugs from his sample kit. He also picked up two guns, at least one of which had been on a bar in the basement. He placed these items in the trunk of his car and then prepared a note in which he said that he and Marian were going on a vacation. Homer then left the note where either Mary Ellen or Steven would find it.

Michael left for a job interview. Homer drove around aimlessly, at one point checking into a motel. From there, he called the family home and talked to Steven, giving him the name of the motel and its phone number. He left the motel sometime after dark and continued to drive aimlessly, ending up at the home of his girlfriend, where he was arrested the next evening. Marian's body remained in his trunk during this entire time.

D. *Michael's Statements*

Approximately one hour after he was first arrested, Michael told police that he slapped Marian during a fight and that he last saw her leaving with Homer about noon on the following day. He revised this statement about an hour and a half later, this time telling his interviewer that he overheard Homer and Marian arguing in the basement and that he ran downstairs after he heard a loud crash. There he saw Homer standing over Marian, with blood on him, saying, "Oh my God, what have I done?" He also told police that he heard Marian moan as he and his father placed her body in the trunk the next day.

Michael did not testify at trial, but both of these statements were related to the jury, as was a third statement. In the early morning hours of November 23, 1974, Michael recanted his two earlier statements and in their place gave a substantially more comprehensive description of what had occurred. Portions of that statement were related to the jury by Mr. DiVito, the same assistant state's attorney who related Homer's statement.

DiVito told the jury that on the evening of November 20, Michael met his father at a prearranged place, Jake's Restaurant in Niles, Illinois. Once there, the two men discussed a plan to imprison Marian until she agreed to sign over the family home and other property to her children. They then left the restaurant and proceeded to the family home, but not before Homer gave Michael an unloaded automatic handgun.

Michael arrived at the family home about the same time that his mother pulled into the driveway. Homer arrived shortly thereafter, having stopped to purchase beer. The three went to the basement, whereupon Michael produced the gun and demanded that his mother sign over the properties. Using a piece of rope that he had brought with him, Homer attempted to bind and blindfold Marian but was not immediately successful. She struggled and kicked Michael in the groin. Michael retaliated by pistol-whipping her, causing her to fall to the floor unconscious.

Marian was bleeding severely, according to Michael, and he and his father wiped up the blood with bath towels. The two men also removed and attempted to wash their blood-stained outer clothing. Mary Ellen and Steven were sent to bed when they returned home.

When Marian regained consciousness during this period of time, Homer would administer chloroform. Homer also cut a slit in Marian's slacks and injected drugs, which Michael could not identify, into her buttocks and anus. Homer had also bound Marian's hands and legs by this time. The two men later carried Marian to her bedroom and Michael thereafter went to sleep.

Michael next saw Marian at about 6:30 a.m. the next day; she was in bed with a bandage wrapped around her head. After Homer assured him that everything was alright, he left for school. He returned around 10:30 a.m. and helped Homer to wrap Marian's trussed and naked body in sheets and blankets from her bed and to place her in the trunk of Homer's car. And while moving her body, he thought that he heard Marian moan. He and Homer then gathered up the handgun, drugs, hypodermic needles, and other articles and placed

them in the trunk along with a shovel.[11] Michael then left to attend a job interview.

## II.

Although given the opportunity on remand to argue that the entirety of Michael's statements was harmful, 896 F.2d at 245, Homer identified only the following portions of Michael's statements as fatal:

1. That Homer planned in advance to kidnap Marian and force her to turn property over to the children;

2. That Homer laid out these plans to Michael and gave him a gun;

3. That Homer and Michael confronted Marian with a gun, and Homer tied her up with a rope he had brought with him;

4. That Homer caused the initial injury to Marian;

5. That Homer administered chloroform to Marian; and,

6. That Michael thought he heard a groan as Marian's body was placed in the trunk of the car.[12]

Taking the issues as framed by Homer, the district court proceeded to decide the harmless error issue in his favor.

Applying the standard for constitutional error originally set forth in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), the district court concluded that the admission of Michael's statements was not harmless beyond a reasonable doubt. First discussing the long-since-vacated conspiracy conviction, the district court concluded that the only direct evidence to support that conviction was Michael's statement about what had occurred at the restaurant. Accordingly, the district court concluded that Michael's statement must have contributed to Homer's conviction and that the admission of that statement was not harmless error.[13]

As to the conviction for aggravated kidnapping, the district court focussed on two aspects of Michael's statements—the state-

---

**11.** The police were also unable to locate this item.

**12.** Homer identified other statements in his reply memorandum before the district court and in his answer brief before this court. The district court gave little or no weight to these statements and we, too, find it unnecessary to consider arguments that are not raised in a timely manner. Given the circumstances that produced a remand in the first place, that result is especially appropriate in this case. *See* 748 F.Supp. at 613–17 & n. 8 (attributing necessity of remand to Homer's expanded argument on appeal and State's willingness to concede propriety of that argument).

**13.** It is unclear how Homer expected to benefit from this attack. As we noted earlier, the state court vacated the conspiracy conviction prior to sentencing, and it makes no sense to petition for a writ of habeas corpus to overturn a vacated conviction. The district court opinion suggests that both a conspiracy conviction and a kidnapping conviction were the predicate felonies for a felony murder conviction. An examination of the jury instructions does not support this suggestion, however, and, in any event, Homer's brief before this court states that kidnapping is the only predicate felony.

Another possible explanation is that Homer is attacking the conspiracy *finding* and not the conspiracy *conviction*. The language used in Homer's argument at times suggests this interpretation and, indeed, the jury instructions for aggravated kidnapping and murder clearly state that Homer could be liable for the acts and mental state of "one for whose conduct he is responsible." Instruction No. 14 defines this phrase as follows:

> A person is responsible for the conduct of another person when, either before or during the commission of a crime, and with the intent to promote or facilitate the commission of a crime, he knowingly aids, agrees or attempts to aid the other person in the planning or commission of the crime.

The problem with this interpretation, however, is that the State has never argued that Homer was liable solely as a conspirator. On the contrary, the State argued before the jury that Homer had masterminded the operation and that he had actually committed the necessary acts. If anyone, it was Michael who would have been liable solely by virtue of his agreement to participate in the alleged conspiracy.

There may be other explanations, but if they have been raised at all, they have been raised in a very opaque manner. As this court has colorfully stated in a recent opinion, "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) (per curiam). The rationale for Homer's argument being far from obvious, and in view of his own failure to offer an explanation, we find it unnecessary to devote continued time or discussion to the vacated conspiracy conviction.

ment that he and Homer agreed to kidnap Marian and the statement that he may have heard Marian moan when he and his father placed her body in the trunk of the car. It then concluded that the State's emphasis on Michael's statements during closing argument "made obvious the intention that the jury should consider *Michael's* statement the main event." 748 F.Supp. at 611. The district court also noted that Michael's statements, even if fully corroborated by other evidence, were of far more value to the State and had a far more damaging impact on Homer by virtue of the fact that they were "presented out of the mouth of Michael." *Id.* And given this "heavy" reliance on Michael's statements, and the relatively thin nature of corroborating evidence, the district court concluded that the admission of Michael's statements could not be construed as harmless error with respect to this conviction as well.

In discussing the murder conviction, the district court noted that the suspect nature of the conspiracy and kidnapping counts precluded a felony murder theory. That fact, it concluded, should be sufficient to cast doubt on Homer's murder conviction. The district court went on, however, to note that the lack of a reference to a seizure in any of Michael's statements was highly damaging to Homer's defense, as was Michael's statement concerning the

agreement to kidnap Marian and the evil intent that it suggested. In view of these observations, the district court concluded that Michael's statements also contributed to Homer's murder conviction.

## III.

▮▮▮ Constitutional error does not require automatic reversal. On the contrary, an otherwise valid conviction need not be set aside if the error is harmless.[14] As the district court correctly stated, however, the standard is strict indeed. A court must be able to say confidently, on the record as a whole, that the error was harmless beyond a reasonable doubt.[15] *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828; *United States v. Hill,* 898 F.2d 72, 75 (7th Cir.1990).

▮▮▮ In making this determination, a court must evaluate the "probable impact" of Michael's statements "on the minds of an average jury." *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969). It should not, however, attempt to act as a jury and determine the ultimate question of Homer's guilt or innocence. The correct inquiry, as articulated by the district court, is whether there exists a "reasonable possibility" that Michael's statements "might have contributed" to Homer's conviction.[16] If so, Homer deserves a new trial.[17]

---

**14.** Certain constitutional errors are assumed to be so serious that they could never be harmless. *See, e.g., Chapman,* 386 U.S. at 23 n. 8, 87 S.Ct. at 828 n. 8 (citing, *inter alia, Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)); *United States ex rel. Fleming v. Huch,* 924 F.2d 679, 683 (7th Cir.1991). Errors arising under the confrontation clause, however, have not been recognized as falling within that category. *See United States ex rel. Lee v. Flannigan,* 884 F.2d 945, 951 (7th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 3277, 111 L.Ed.2d 786 (1990).

**15.** The burden of proof is on the State. *See Chapman,* 386 U.S. at 24, 87 S.Ct. at 828; 748 F.Supp. at 609 & n. 8.

**16.** *See United States ex rel. Sanders v. Lane,* 835 F.2d 1204, 1206 (7th Cir.1987) (citing *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828); *see also United States v. Towns,* 913 F.2d 434, 446 (7th Cir. 1990).

In *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the Supreme Court set out a number of factors that are useful in determining whether an error is harmless in a particular case. Those factors include: (1) the importance of the witness's testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case. *Id.* at 684, 106 S.Ct. at 1438 (citing *Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972); *Harrington,* 395 U.S. at 254, 89 S.Ct. at 1728).

**17.** The Supreme Court has not always been precise in choosing words to articulate the *Chapman* standard, and the language of some of its opinions suggests at times that the correct analysis is whether the jury would have convicted the defendant in a trial without the unconstitutionally admitted evidence. *See* W. LaFave &

As to the standard of appellate review, our initial opinion raised the question of how much deference should be accorded a district court's findings regarding harmless error. 896 F.2d at 244 (noting our circuit's prior lack of focus on the issue). We also suggested that deferential review was "more consonant with principles that govern the ordinary roles of district and appellate judges." *Id.* We expressly refused to decide the issue, however, until it had been fully briefed.

Despite this clear invitation to the parties, we presently find ourselves in roughly the same position as before. Only Homer has addressed the issue, not surprisingly advocating the view that the findings of the district court, which has now reviewed this record six times (three times regarding Homer and three times regarding Michael), are entitled to deference. The State, on the other hand, did not address the issue in its opening brief. Nor did it use its reply brief to respond to Homer's argument. We can only conclude, therefore, that both parties to this case are in agreement that the district court's findings must be reviewed in a deferential manner; a true resolution of this issue must wait for another day.

### IV.

At long last arriving at a point where we can apply the relevant standards to this case, we find that at least two of the statements identified by Homer are capable of summary disposition. The first is the statement that Homer caused the initial injury to Marian, which derives from Michael's second statement and its image of Homer standing over Marian's body, with blood on him, saying "Oh my God, what have I done?" The district court's initial opinion resolved this issue against Homer, 695 F.Supp. at 383–88, and this court found that treatment persuasive. 896 F.2d at 243; *see also* 748 F.Supp. at 611 n. 11 (district court subsequently reaffirmed its belief in the earlier analysis).[18] Homer has not asked us to overrule our prior determination, and to the extent his present argument incorporates any new insights it is simply too late.[19]

■ We can also reject as inconsequential Michael's suggestion that he may have heard a moan. In response to Homer's identification of this statement as harmful, the State argued before the district court that Michael's suggestion was merely cumulative of the pathologist's testimony that Marian had eaten approximately four to six hours before her death. Based on this testimony, the State argued that the jury concluded that Marian had eaten sometime after she had been placed in the trunk and, therefore, that she had been alive when placed in the trunk. Homer responded with strong criticism and in the process conceded away the ultimate issue.

As Homer put it:

"[I]t challenges the imagination to believe that twelve reasonable jurors concluded that Homer had bound and gagged Marian and loaded her, naked, into his car, and had then either spoonfed her in that position or untied her and taken her out to eat, before injecting her

J. Israel, Criminal Procedure § 26.6 (1984 & Supp.1990) (providing examples). The Supreme Court has yet to overrule or formally modify *Chapman,* however, and we must continue to respect its holding until that day.

**18.** Homer's attack stands in odd contrast to his argument that the findings of the district court should be accorded great deference.

**19.** This is not the only argument by the parties that suggests a puzzling unfamiliarity with this court's prior decision. The State continues to urge that Homer's convictions are beyond challenge by virtue of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *See* 896 F.2d at 245 (outlining State's argument). The purpose of remand, however, was solely to determine whether the constitutional error was harmless; remand was not granted so that the State could reopen the issue of whether a constitutional error existed in the first place. And even if properly raised on remand, we find that (contrary to the suggestion of the State's briefs) we explicitly considered and rejected the *Teague* argument in our first opinion. *See id.* (concluding that State had waived any argument based on *Teague* by failing to raise retroactivity objection when district court asked for briefing on *Cruz v. New York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987)). That treatment is still persuasive, and we see no reason to revisit it.

with a lethal dose of drugs and returning her bound, gagged, and naked, as before, to the trunk of the car. It is far more likely that the jury simply concluded either that the medical evidence was off by a few hours or that Marian had somehow eaten during the night of November 20–21, before she died on the morning of the 21st."

748 F.Supp. at 611 n. 10 (quoting Homer's reply memorandum).[20] This reasoning does more than dispute the State's argument, it takes the position that a reasonable jury would not have believed that Marian was alive when Homer and Michael placed her in the trunk. But if the average jury would not have believed that proposition, then there is no reasonable possibility that the error of admitting Michael's statement about the moan could have contributed to Homer's conviction. The average jury, after all, would quickly reject an unbelievable argument.

All that remains, then, are those portions of Michael's statements that tend to suggest a scheme to kidnap Marian. In scrutinizing Homer's aggravated kidnapping conviction, the district court assumed for the sake of argument that each of these allegedly incriminating statements was corroborated by other evidence. Nevertheless, the district court concluded, the error could not have been harmless because of the prosecution's "heavy" reliance on Michael's statements and because of the comparatively thin nature of this corroborating evidence.

We cannot agree, however, with the district court's conclusion that the State relied heavily on Michael's statements. This conclusion, as explained in the district court

opinion, relies exclusively on a single statement by Homer's prosecutor during the course of closing arguments:

"We don't want sympathy. I could stand before you and tell you and look you straight in the face and tell you that the people of the community, based on the evidence that you have got, *corroborated admissions to the deputy state's attorney* of this county, the people of this community demand justice from you."

748 F.Supp. at 611 (quoting Trial Transcript at 1712) (emphasis added by district court). There is a certain danger, however, in relying conclusively on one phrase from a transcript that spans approximately 1750 pages, 123 pages of which are attributable to closing arguments. That danger is implicitly recognized at another point in the district court's opinion [21] and deserves consideration as well in this instance.

"A reviewing court must begin with the reality that the jurors sat in the same room day after day with the defendants and their lawyers." *United States v. Hasting*, 461 U.S. 499, 511, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983). The State's closing argument, including rebuttal, occupies some sixty-three pages of transcript. In delivering that argument, the State did make references to Michael's statements, but most of these references appear inconsequential.[22] Homer does find fault with a summary of Michael's third statement but fails to mention that this reference was part of a comprehensive summary of the trial testimony that was performed without special emphasis. The district court's first opinion found a similar reference unobjectionable,

**20.** Evidence was also elicited from the pathologist to the effect that a decomposing body emits gases, creating a sound that could be mistaken for a moan.

**21.** *See* 748 F.Supp. at 612 (referring to Homer's "Blame it all on me...." statement); *see also* 695 F.Supp. at 386 (district court's first opinion analyzing closing argument statements in context).

**22.** For example, Homer complains of a reference during closing argument to the fact that Michael may have heard his mother moan as he and his father were placing her in the trunk.

Our previous discussion, however, indicates that Homer has at another point in his argument conceded that this type of statement could have had no effect on the jury.

Homer also complains that the State referred to Michael's statement in an attempt to discredit Homer's assertion that Marian had arranged the meeting on November 20. Homer has not, however, cited any other attempts by the State to impeach his testimony in this manner. The apparently isolated and indirect nature of this conduct, along with the fact that the underlying dispute was, at best, peripheral to the case, makes this statement an unlikely source of harmful error.

695 F.Supp. at 386, and the same rationale would apply here.

The State's request that the jury rely on "corroborated admissions to the deputy state's attorney" is also less consequential when viewed in context. That request, made during rebuttal, was in response to an argument by Michael's attorney that, especially in light of Homer's efforts to deny his son's participation, the only evidence implicating Michael was his own statements. And, Michael's attorney continued, those "uncorroborated" statements were unreliable in view of the manner in which they were obtained and related to the jury.

■ An examination of the surrounding text reveals that the State was arguing only that Michael's admissions were, in fact, "corroborated." It was not arguing, as Homer and the district court now suggest, that the jury should look first and foremost to Michael's statements in reaching its verdict.[23] If anything, the focus of the State's closing was *Homer's* testimony, which the State portrayed as hopelessly at odds with itself. There was thus no real reliance on Michael's statements, much less "heavy" reliance, which makes it less likely that those statements could have contributed to Homer's conviction.[24]

Nor can we agree with the district court's characterization of the other evidence that supported the kidnapping charge. Homer's own testimony revealed that he was willing to get Marian away from the influence of her family "for a few days."[25] Homer also testified that his fear of arrest caused him to inject Marian with a tranquilizer and to put tape over her mouth to conceal her presence from, among others, his daughter and his brother-in-law. His statement to the police revealed that chloroform was used.

It could not have escaped the jury's attention, moreover, that guns were involved. Homer himself testified that he picked up two handguns, at least one of which was lying on the bar in the basement, while cleaning up the other "evidence." In his statement to the police he divulged the location of the guns at the same time that he revealed the whereabouts of such evidence as the drugs and Marian's clothing. He also admitted that Michael had used a gun to hit Marian. At no time, however, did Homer explain why it was necessary for weapons to be present during this allegedly amicable meeting with his wife.

The significance of this evidence should not be lightly dismissed. The jury instructions for aggravated kidnapping, after all, required only a finding that Homer, acting with knowledge and intent, secretly confined Marian against her will[26] (and in the process inflicted great bodily harm upon her).[27] Homer's own testimony goes a long

**23.** *Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987), cited by Homer, is therefore inapplicable.

**24.** The dynamics of the trial back up our conclusion. The admission of both defendants' statements was hotly contested and Homer's and Michael's attorneys were quite diligent in making objections when the State's presentation might have suggested to the jury that one defendant's confession was relevant in determining the guilt of the other. There was no such objection to the State's reference to "corroborated admissions," however. Although the lack of an objection is obviously not conclusive, it tends to suggest at least that the defense attorneys, who were on the lookout for such statements, did not interpret the State's reference as arguing that the jury should concentrate on Michael's statements in determining Homer's guilt.

**25.** Any innocent construction that might have been placed on that language quickly dissipated

as Homer relayed his divorce lawyer's negative response to the same remark. *See supra* note 7.

**26.** Homer has never attempted to argue that his attempt to secrete Marian was not against her will.

**27.** In relevant part, Instruction No. 55 states:
To sustain the charge of aggravated kidnapping, the State must prove the following propositions:
*First:* That the defendant, Homer Hanrahan, or one for whose conduct he is responsible, acted knowingly; and
*Second:* That the defendant, Homer Hanrahan, or one for whose conduct he is responsible, secretly confined Marian Hanrahan against her will; and
*Third:* That when the defendant, Homer Hanrahan, or one for whose conduct he is responsible, did so he intended secretly to confine Marian Hanrahan against her will; and

way in meeting the State's burden and, in view of the source, must be viewed as having a more detrimental impact upon his defense than Michael's statements. *See Morrison v. Duckworth*, 929 F.2d 1180 (7th Cir.1991) (purported constitutional error held harmless when defendant's own statements admitted elements of crime); *see also Arizona v. Fulminante*, —— U.S. ——, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991) (" '[T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct.' ") (quoting *Bruton v. United States*, 391 U.S. 123, 140, 88 S.Ct. 1620, 1630, 20 L.Ed.2d 476 (1968) (White, J., dissenting)). Michael's statements certainly indicate that Homer attempted to kidnap Marian, but in many ways these references are merely cumulative of other, more damaging, evidence dictating the same conclusion.[28] It is therefore less likely that Michael's statements contributed to Homer's conviction.

It is unlikely, moreover, that a jury would accept Michael's statements at face value. As Michael's trial counsel emphasized to the jury, DiVito's recollection of Michael's third statement derived from a short memorandum that was initiated over four hours after his conversation with Michael and which incorporated only the highlights of what was apparently a very long interview. Michael's three-stage confession also demonstrated a reluctance to accept responsibility for his own actions and a simultaneous willingness to shift an undue portion of the blame toward his father. This reluctance tainted his third statement, and a jury is likely to be skeptical of testimony that may not be entirely frank. These apparent weaknesses in Michael's statements certainly make it less likely that they contributed to Homer's conviction.

Supreme Court precedent also suggests the necessity and appropriateness of an analysis of Homer's defense. *See, e.g., Hasting*, 461 U.S. at 511–12, 103 S.Ct. at 1981–82. The less believable the defense, after all, the more likely the conclusion that the constitutional error did not contribute to the conviction. *See, e.g., Phelps v. Duckworth*, 772 F.2d 1410, 1414 (7th Cir.) (en banc) (defendant's inconsistent and implausible testimony supports finding of harmless error), *cert. denied*, 474 U.S. 1011, 106 S.Ct. 541, 88 L.Ed.2d 471 (1985).[29]

Here, Homer's defense had some obvious problems. His testimony at trial contradicted his statement to DiVito and, to a certain extent, his statements to Mary Ellen. In addition, he asserted that Marian's death was accidental but was unable to

---

*Fourth:* That the defendant, Homer Hanrahan, or one for whose conduct he is responsible, inflicted great bodily harm upon Marian Hanrahan.

Contrary to Homer's suggestion, it was not necessary for the jury to believe that Marian was alive when placed in the trunk in order to convict Homer of kidnapping. Indeed, the jury could quite clearly conclude that Homer's own version of events satisfied the instructions.

28. Admittedly, the challenged statements portray some of the facts in a slightly different manner than the remainder of the evidence. The distinctions are not crucial to the underlying charge, however. So long as there was evidence to establish beyond a reasonable doubt that Homer, acting with knowledge, intended to secrete Marian against her will and that he in fact secreted her against her will, thereby inflicting great bodily harm, the minutiae of factual detail surrounding the commission of the crime is interesting but largely irrelevant.

If we presume, as we must, that the jury followed the instruction on aggravated kidnapping, then it matters little, for example, where Homer developed the idea to kidnap Marian or the precise nature of what he wanted to accomplish. Likewise, once we know that weapons were used, it is a minor detail whether they were revealed immediately. And with Homer's own admission that he injected Marian with a tranquilizer and taped her mouth shut, it hardly matters whether he went the extra distance at that point and tied her up. Nor does it matter whether Homer brought the rope with him to the house or found it lying in the family home. As to the chloroform, Homer (the one with experience in its use) admitted that it was used and gave no indication that he objected to its use. That being said, the determination of who actually administered the chloroform—Homer or Michael—should not have altered the jury's decision.

29. Of course, to go beyond this inquiry and to decide Homer's innocence or guilt would usurp the function of a jury. To determine that one party's version of events is less believable, however, is not to make that ultimate determination.

reconcile his version of events effectively with either the physical evidence (such as the morphine, chloroform, and guns) or his own actions (such as concealing evidence and keeping his wife's body in the trunk of his car for two days).

Most importantly, Homer's defense depended heavily on the jury's willingness to believe that Marian had suffered an epileptic seizure. The district court recognized this reliance when it discussed the harmful effect of Michael's failure to mention a seizure, 748 F.Supp. at 612, but that logic has broader application. Michael was not the only person who failed to mention an epileptic seizure. Homer's own testimony reveals that he told *no one* about the seizure—Mary Ellen, Steven, the brother-in-law, the hospital . . . the list goes on. If the district court is correct in concluding that Michael's omission prejudiced Homer's defense, then Homer's own omission must have had an even more damaging impact. *See Fulminante*, 111 S.Ct. at 1257.

Viewed in a vacuum, it is not difficult to conclude that Michael's statements could have contributed to Homer's kidnapping conviction. Those statements were not made in a vacuum, however, and we cannot analyze them in that manner. Viewed within the context of the trial as a whole, Michael's relatively unemphasized statements had an effect that was substantially preempted by Homer himself. It was Homer who told the jury that his fear of going to jail caused him to drug and gag Marian so that no one would hear her. It was Homer who was unable to reconcile his version of events effectively with either the physical evidence or his own actions. It

was Homer's sudden reference to an epileptic seizure that made his defense appear weak and uncorroborated. And it is simply unnecessary to indulge the argument that Michael's statements contributed to Homer's conviction when there exists a perfectly rational explanation for the jury's verdict, completely consistent with the judge's instructions. *See Schneble*, 405 U.S. at 432, 92 S.Ct. at 1059. We are thus satisfied beyond a reasonable doubt that the challenged statements did not contribute to Homer's conviction for aggravated kidnapping.

As to the murder conviction, it would appear that the reasoning set forth in the district court's first opinion has already resolved the harmless error issue.[30] In analyzing the effect of Michael's second statement, the district court concluded (in addition to the fact that the State had not emphasized the testimony during closing argument) that: (1) it is unlikely that the jury followed a felony murder theory; (2) Michael's second statement "would have been of less importance to the jury in assigning responsibility for Marian's death" because it shed no light on the cause of death, morphine intoxication; and (3) Homer's own testimony accounted for the jury's verdicts. 695 F.Supp. at 387. Although that opinion addresses only Michael's second statement, its reasoning is also relevant to Michael's other statements. Our first opinion found this reasoning persuasive, and it is no less persuasive in the present context.[31]

The possibility that the felony murder doctrine explains Homer's murder conviction must be discounted if for no other

**30.** The reasoning in the district court's first opinion is distinguishable insofar as Homer's kidnapping conviction is concerned. It is not distinguishable, as we shall see, insofar as Homer's murder conviction is concerned.

**31.** Homer also conceded at oral argument that the evidence showed that he was guilty of some crime. That crime, he maintained, was manslaughter, and the difference between that conviction and a murder conviction was Michael's statements. This argument forgets, however, that an Illinois appellate court opinion has already addressed and rejected Homer's suggestion that the trial court should have instructed

the jury on involuntary manslaughter. That opinion, noting that Homer admitted that he voluntarily and wilfully injected drugs into Marian, taped her mouth shut, and refused to call a doctor—all evidence that came from Homer, not Michael—concluded that Homer's conduct could in no way be construed as reckless and would in no way merit an instruction on involuntary manslaughter. 64 Ill.App.3d at 215, 380 N.E.2d at 1081, 20 Ill.Dec. at 872. We owe a certain deference to that finding, *see* 28 U.S.C. § 2254(d), and Homer has never bothered to explain why the finding is either incorrect or inapplicable.

reason than the fact that the parties themselves have discounted it. Homer has always argued, and continues to argue on this appeal, that Michael's acquittal on the murder charge suggests that the jury did not use a felony murder theory. The State, moreover, did not emphasize the doctrine during trial; it relied instead on theories in which Homer intended to kill Marian (or do her great bodily harm) or at the least knew that his acts would cause, or would create a strong probability of, death (or great bodily harm).[32]

Indeed, prompted in no small part by the arguments of Homer's trial counsel, the State emphasized the fact that Marian died of morphine intoxication. Michael's statements spoke at most of kidnapping, however, not murder. They said absolutely nothing about morphine and gave no hint as to the source of that drug. Therefore, under the same reasoning set out in the district court's first opinion, Michael's statements would have had less significance to the jury.

Keeping in mind that we have already rejected some of the district court's other findings, the only remaining development in the second opinion is the observation that Michael's reference to a kidnapping plot "has the unmistakable implication that [Homer's and Michael's] evil intent carried through to the later actions." 748 F.Supp. at 612. But even if this implication would support a conclusion that the error here was harmful, the notion that any of Michael's statements could have contributed to Homer's murder conviction was soundly rejected by the district court's first opinion. There, in dismissing Homer's argument that only the "Oh my God, what have I done?" statement could explain his murder conviction, the district court reasoned:

> Where Homer's argument collapses, however, is that there were ample rea-

sons for the jury to reach different conclusions as to the two defendants under the stated murder theories other than the challenged statement by Michael. All the trial evidence showed Homer, rather than Michael, was the one with knowledge of drugs from his educational background in the sciences and his previous employment as a pharmaceuticals salesman. It was also well within the jury's purview to conclude the injection of drugs into Marian was not within the scope of the conspiracy between Homer and Michael, but was Homer's independent action to an unintended injury to Marian. Indeed, the jury was certainly entitled to credit Homer's own testimony that Michael had no involvement in the application of drugs to Marian and that Michael had repeatedly urged Homer to seek medical assistance for her. Any or all of those reasons plausibly account for the jury's verdict. There is not the slightest indication that Michael's ... [second] statement ... could have made a difference in (let alone its having been the source of) the jury's decision to convict Homer of his wife's murder.

695 F.Supp. at 387. That same reasoning applies here; if Homer's own testimony accounted for the jury's decision to convict him of murder, then Michael's statements —first, second, and third[33]—could not have had the effect that Homer now urges.

We have already described the district court's first opinion as persuasive, 896 F.2d at 243, and the broad reasoning within that opinion guides the present disposition. Given that reasoning, as well as our prior discussion, we are satisfied beyond a reasonable doubt that the challenged evidence did not contribute to Homer's murder conviction.

---

**32.** To the extent that felony murder may have been a theory espoused by the jury, our prior discussion of Homer's kidnapping conviction forecloses any serious argument that the error was not harmless.

**33.** If anything, Michael's third statement is even less open to challenge than his first or second. The jury clearly accepted a theory of the case in which Michael and Homer were not partners in Marian's murder. Michael's first and second statements supported that theory by blaming everything on Homer. Michael's third statement, however, spoke more of a joint effort, making it less likely that the jury paid attention to the third statement in assigning responsibility for Marian's death.

V.

For the aforementioned reasons, the decision of the district court is

REVERSED.